# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| PATRICK ANDRE TAYLOR II & TITUS WILEY, on behalf of themselves and all others similarly situated, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| DELTA COUNTY, FORMER SHERIFF RICKY SMITH, CHARLA SINGLETON, COUNTY ATTORNEY JAY GARRETT, COUNTY JUDGE JASON MURRAY, and ZACH WILLIAMSON, | § § § § § § § § | Civil Action No. 4:22-cv-250 Judge Mazzant |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are six motions for summary judgment: (1) Defendant Jason Murray's Motion for Summary Judgment (Dkt. #56); (2) Defendant Jay Garrett's Motion for Summary Judgment (Dkt. #58); (3) Defendant Charla Singleton's Motion for Summary Judgment (Dkt. #60); (4) Defendant Ricky Smith's Motion for Summary Judgment (Dkt. #62); (5) Defendant Zach Williamson's Motion for Summary Judgment (Dkt. #64); and (6) Defendant Delta County's Motion for Summary Judgment (Dkt. #66). Having considered the Motions, the relevant pleadings, and the applicable law, the Court finds as follows:

1.  Defendant Jason Murray's Motion for Summary Judgment (Dkt. #56) should be **GRANTED**;

2.  Defendant Jay Garrett's Motion for Summary Judgment (Dkt. #58) should be **GRANTED**;

3.  Defendant Charla Singleton's Motion for Summary Judgment (Dkt. #60) should be **GRANTED**;

4.      Defendant Ricky Smith's Motion for Summary Judgment (Dkt. #62) should be **GRANTED**;

5.      Defendant Zach Williamson's Motion for Summary Judgment (Dkt. #64) should be **GRANTED**; and

6.      Defendant Delta County's Motion for Summary Judgment (Dkt. #66) should be **GRANTED**.

## BACKGROUND

This putative class action arises under 42 U.S.C. § 1983 and Texas law. Plaintiffs claim to have been victimized by numerous civil rights violations at the hand of Delta County and its officials. According to Plaintiffs, this case involves an unlicensed law enforcement officer wielding the power entrusted to him as a peace officer without a valid Texas peace officer's license to do so. Plaintiff also claims that, when questions began to arise, Delta County officials covered up their decision to hire him. In the wake of one month of alleged unlawful searches, seizures, and detentions, Plaintiffs claim to have suffered various constitutional violations under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

## I.      Factual Background

In short, this case involves a law enforcement officer whose peace officer's license went invalid when he failed to complete his state-mandated training. Delta County hired him and allowed him to act as a peace officer. During that time, he engaged in traditional law enforcement activities—pulling people over, searching them, arresting them, and sometimes using force against them. All the while, according to Plaintiffs, Delta County knew his license was invalid and allowed him to continue policing the streets. Plaintiffs claim that Delta County learned that Deputy Williamson was acting without a peace officer's license in violation of Texas law and started to cover their tracks with fraudulent paperwork. When suspicions turned to hard accusations levied

by Texas State Troopers and County Judges, Delta County allegedly engaged in a full-blown conspiracy to cover up what they had done.

Before explaining the full substance of this case as Plaintiffs allege, a few words about the cast of characters are helpful. Delta County, Texas, just south of Texas and Oklahoma's shared border, is home to the Delta County Sheriff's Office (Dkt. #28 at p. 4). Ricky Smith ("Sheriff Smith") is the Former Sheriff elected to the Delta County Sheriff's Office (Dkt. #28 at p. 4). Charla Singleton ("Sheriff Singleton") is the current Sheriff elected to the Delta County's Sheriff's Office (Dkt. #28 at p. 4). Before taking the reins as Sheriff, she served Delta County as a Chief Deputy (Dkt. #28 at p. 4). Jay Garrett ("Attorney Garrett") is Delta County's elected County Attorney (Dkt. #28 at p. 4). Judge Jason Murray ("Judge Murray") is a former elected Delta County Judge (Dkt. #28 at p. 4). Zach Williamson ("Deputy Williamson") is a former Deputy of Delta County Sheriff's Department (Dkt. #28 at p. 7). Plaintiffs allege that, individually and collectively, each of these actors violated their rights. That takes us to where this case begins: Deputy Williamson.

### A.    Deputy Williamson's Path to Delta County

At all times relevant to this lawsuit, Deputy Williamson was an employee of the Delta County Sheriff's Office (Dkt. #28 at p. 6).[1] Deputy Williamson began his career in law enforcement on September 12, 2002, when he earned his Texas Peace Officer's License (Dkt. #28 at p. 6). In Texas, one cannot lawfully be employed as a peace officer without a valid Peace Officer's License.

---

[1]  Unless otherwise indicated, the facts as the Court recounts them in the Background Section of this Memorandum Opinion and Order are from Plaintiff's First Amended Complaint (Dkt. #28). Because the matter before the Court is at the summary judgment stage, when the Court relies on summary judgment evidence, it will cite accordingly to that exhibit by its corresponding docket and page number (e.g., Dkt. #1 at p. 1).

*See* TEX. OCC. CODE ANN. § 1701.301. From his initial licensure until 2019, Deputy Williamson worked in various law enforcement agencies as an officer for "short stints" (Dkt. #28 at p. 6).

It is undisputed that Defendant's history in law enforcement includes allegations of some misconduct, though the parties contest the full extent.[2] In 2013, Defendant served Red River County as a Sheriff's Deputy (Dkt. #28 at p. 6). During his tour in Red River County, according to Plaintiffs, Deputy Williamson "conducted an unlawful arrest based on an invalid arrest warrant" and "deployed a patrol rifle" in such a "dangerous manner" that the County Sheriff described the incident as having "put people's lives at risk" (Dkt. #28 at p. 6).

Five years later, Deputy Williamson became a Police Officer in Honey Grove, Texas (Dkt. #28 at p. 7). A new county brought a new allegation. While there, Deputy Williamson is alleged to have deployed lethal force in an apparent racially charged altercation (Dkt. #28 at p. 7).[3] Though Williamson was sued as a result, the parties settled out of court (Dkt. #28 at p. 7). Williamson resigned his post in Honey Grove, and "his employment file was marked ineligible for rehire" at Honey Grove (Dkt. #28 at p. 7).

Deputy Williamson then became an officer for the Clarksville Police Department until he was discharged on August 5, 2019 (Dkt. #28 at p. 7). Because Deputy Williamson did not keep up to date with various training obligations mandated by the state of Texas, his peace officer's license went inactive and expired (Dkt. #28 at p. 7).

---

[2]  Plaintiffs, as is obvious from the face of their First Amended Complaint and their claim that Delta County is liable for Deputy Williamson's alleged misconduct, believe Deputy Williamson to be nothing short of a walking constitutional violation with a badge and gun (*See generally* Dkt. #28 at pp. 6–8, 39–41). Defendants, however, claim that Deputy Williamson was cleared of any wrongdoing in his prior use of force allegation (*See, e.g.*, Dkt. #64 at p. 29) (citing Dkt. #62-1 at p. 66).

[3]  (Dkt. #74 at p. 14 n.11) (citing *Mackey v. City of Honey Grove, Texas et al.*, 4:20-cv-313 (E.D. Tex.))

In September of 2019, Deputy Williamson found a new job: the Delta County Sheriff's Office (Dkt. #28 at p. 8). Sheriff Smith gave the green light on his hiring even though, according to Plaintiffs, he knew that Deputy Williamson was ineligible to function as a law enforcement officer (Dkt. #28 at p. 8). On October 2, 2019, Plaintiffs claim that the Delta County Sheriff's Office "falsely certified on a notarized State of Texas document that it possessed the appropriate documentation" to indicate that Deputy Williamson was a licensed peace officer (Dkt. #28 at p. 8). Plaintiff avers that Deputy Williamson then "falsely signed" under penalty of perjury a document swearing that he "possessed the minimum standards for immediate reinstatement" of his license (Dkt. #28 at p. 8). Just after the ink dried, Deputy Williamson took his oath of office (Dkt. #28 at p. 8). Soon after, the Delta County Sheriff's Office submitted documents to the Texas Commission on Law Enforcement ("TCOLE") to reflect Deputy Williamson's new appointment (Dkt. #28 at p. 9). According to Plaintiffs, TCOLE immediately rejected Deputy Williamson's appointment for want of a valid peace officer's license as required by Texas law (Dkt. #28 at p. 9). Despite "actual knowledge" that Texas law would render Deputy Williamson unable to serve as a peace officer, the Delta County Sheriff's Office sent Deputy Williamson out to protect the streets that same day (Dkt. #28 at p. 9). This is where the story begins.

### B.    Wiley's Arrest, Incarceration, & Institutionalization

Just six days after being sworn in (and allegedly six days after the Delta County Sheriff's Office learned of his expired license), Plaintiffs claim that Deputy Williamson violated Titus Wiley's ("Wiley") constitutional rights. According to Plaintiffs, on October 8, 2019, Wiley attended his son's peewee football practice in Delta County (Dkt. #28 at p. 9). For a moment, he left to visit his mother, who lived nearby (Dkt. #28 at p. 9). Upon his return to the football field, Wiley drove into the parking lot, where he noticed Deputy Williamson and another Delta County

Deputy were parked (Dkt. #28 at p. 9). Wiley stepped out of his vehicle, and Deputy Williamson "immediately detained Wiley and asked him to provide identification" (Dkt. #28 at p. 9) (cleaned up). Deputy Williamson then began to interrogate Wiley (Dkt. #28 at p. 10). After determining that Wiley "did not currently have his license," Deputy Williamson placed Wiley under arrest for a traffic violation (Dkt. #28 at p. 10). Deputy Williamson then put Wiley in his patrol vehicle and searched Wiley's vehicle (Dkt. #28 at p. 10). Afterwards, Deputy Williamson "issued a sworn citation that charged Wiley with disorderly conduct and driving while license invalid" (Dkt. #28 at p. 10) (cleaned up). According to Plaintiffs, Deputy Williamson "deliberately excluded" from the citation his lack of an active peace officer's license (Dkt. #28 at p. 11).

Deputy Williamson took Wiley to Delta County's jail (the "Jail"), which the Delta County Sheriff's Office operated (Dkt. #28 at p. 11). There, Deputy Williamson executed a sworn probable cause affidavit to support Wiley's arrest for both alleged offenses (Dkt. #28 at p. 11). In doing so, Plaintiff claims that Deputy Williamson again "deliberately excluded" from the affidavit the invalid status of his peace officer's license (Dkt. #28 at p. 11).

On October 9, 2019, Delta County officials brought Wiley before Delta County Justice of the Peace Shannon McCulloch ("JP McCulloch") for arraignment (Dkt. #28 at p. 11).[4] JP McCulloch arraigned Wiley based on Deputy Williamson's affidavit, which Plaintiffs claim was "materially false" (Dkt. #28 at p. 11). Unaware that Deputy Williamson "unlawfully arrested him," Wiley pleaded guilty to both offenses (Dkt. #28 at p. 11). JP McCulloch, equally unaware of any problem, imposed a criminal penalty of $590 (Dkt. #28 at p. 11). Because Wiley could not pay the

---

[4]  Article 14.06 of the Texas Code of Criminal Procedure requires that an arrested person be taken before a magistrate without unnecessary delay but not later than forty-eight hours after the arrest where the arrest occurs without a warrant. TEX. CODE OF CRIM. PROC. art. 14.06.

fine, JP McCulloch ordered that he serve an eight-day jail stint to "pay" the fine (Dkt. #28 at p. 11) (internal quotations omitted). Thus, he was scheduled to be released on October 16, 2019.

When Wiley returned to the Jail, he advised detention officers that he suffered from schizoaffective disorder and was prescribed Zyprexa as a treatment (Dkt. #28 at p. 12). Wiley specifically asked that the Jail provide him his medication (Dkt. #28 at p. 12). According to Plaintiffs, the officers refused (Dkt. #28 at p. 12). Plaintiffs also claim that Sheriff Smith learned of Wiley's diagnosis and prescription (Dkt. #28 at p. 12). Rather than provide Wiley his medication, however, Sheriff Smith is alleged to have gone to Wiley's jail cell to ask whether Wiley "actually needed" his medication (Dkt. #28 at p. 12). Plaintiffs claim that Sheriff Smith and Wiley "did not speak at that time" (Dkt. #28 at p. 12). Nonetheless, after, Sheriff Smith "deliberately instructed his detention officers at the jail to withhold Wiley's" medication, according to Plaintiffs (Dkt. #28 at p. 12) (cleaned up). In the eight days that followed, Plaintiffs submit that Wiley did not receive his medication (Dkt. #28 at p. 12). Predictably, psychosis took its hold (Dkt. #28 at p. 12).

The day Wiley was set to be released—October 16, 2019—the Delta County Sheriff's Office "refused" to release Wiley from custody (Dkt. #28 at p. 13). That decision contravened JP McCulloch's express order (Dkt. #28 at pp. 11, 13). JP McCulloch then received notice of Wiley's continued incarceration (Dkt. #28 at p. 13). JP McCulloch, in turn, confirmed that Wiley remained incarcerated, summoned him to the courthouse, gave him an additional $185 credit for time served, and ordered his immediate release (Dkt. #28 at p. 13). The Delta County Sheriff's Office did not obey that order. Instead, Sheriff Smith contacted a Texas District Judge in Paris, Texas and demanded that Wiley be institutionalized, ostensibly due to outward manifestations of his schizophrenia, which, left unmedicated, "dramatically altered his behavior" while in custody (Dkt.

7

#28 at p. 13). The District Judge obliged and signed an order requiring Wiley's institutionalization at the Kerrville State Hospital (Dkt. #28 at p. 13). Subsequently, Delta County officials took Wiley to Kerrville State Hospital "for an indefinite period" (Dkt. #28 at p. 13).

### C.    Taylor's Arrest

While Wiley remained institutionalized, Deputy Williamson continued to patrol Delta County, still allegedly without a valid peace officer's license. Enter Plaintiff Patrick Andre Taylor II ("Taylor"). On October 19, 2019, Taylor pulled his vehicle into his driveway after driving home (Dkt. #28 at p. 14). "Without cause or warning," Deputy Williamson "came out of nowhere and drove to the front of Taylor's home, got out of his car, and shouted: 'why did you run from me?'" (Dkt. #28 at p. 14) (cleaned up). To this surprise inquisition, Taylor responded that he "did not intend to run from any police officer, and that he had not seen [Deputy] Williamson or any police lights" (Dkt. #28 at p. 14). No less, Plaintiffs allege that Deputy Williamson escalated the situation, first grabbing Taylor's arm and forcing him to turn around and continuing to push Taylor "face first" on Taylor's vehicle (Dkt. #28 at p. 14). Taking out his handcuffs and requesting Taylor's compliance, Deputy Williamson did not give Taylor an opportunity to submit, according to Plaintiffs. Deputy Williamson said: "want to make this painful?" (Dkt. #28 at p. 14). According to Taylor, Deputy Williamson instructed him to "put his other hand behind his back while" "painfully forc[ing] one arm up against his back" (Dkt. #28 at p. 14). Then, Deputy Williamson, "without warning or justification," "slammed Taylor onto the ground," which in turn caused Taylor's head to hit the ground, causing a "likely concussion" (Dkt. #28 at p. 14). Deputy Williamson continued to place Taylor in a chokehold (Dkt. #28 at p. 14). With a knee on Taylor's back, Deputy Williamson waited for backup (Dkt. #28 at p. 14). When Deputy Williamson's sergeant arrived, he assisted Deputy Williamson in "pinning Taylor to the ground" (Dkt. #28 at p. 15) (cleaned up). Deputy

Williamson arrested Taylor for resisting arrest (Dkt. #28 at p. 15). Deputy Williamson then searched Taylor (Dkt. #28 at p. 15).

Deputy Willamson and his sergeant placed Taylor in a patrol car (Dkt. #28 at p. 15). Subsequently, Deputy Williamson searched Taylor's vehicle (Dkt. #28 at p. 15). Deputy Williamson continued to execute a probable cause affidavit to support Taylor's arrest and charges of driving while intoxicated, resisting arrest, and public intoxication (Dkt. #28 at p. 15). Plaintiff contends that the affidavit included "a breathalyzer or sobriety test on the scene" (Dkt. #28 at p. 15). As was the case with Wiley, Deputy Williamson again omitted the status of his peace officer's license from the affidavit (Dkt. #28 at p. 15). Taylor awaited arraignment at the Delta County Jail (Dkt. #28 at p. 16). JP McCulloch arraigned Taylor based on Deputy Williamson's affidavit, which Plaintiffs claim was defective because of his license's status. (Dkt. #28 at p. 16).

### D.    The Alleged Cover-Up

According to Plaintiffs, after Wiley and Taylor's arrests, on October 24, 2019, the Delta County Sheriff's Office "again falsely certified on a notarized State of Texas document that it possessed the appropriate documentation to show that Deputy Williamson was licensed as a peace officer" (Dkt. #28 at p. 16) (cleaned up). Likewise, Deputy Williamson swore under penalty of perjury on a notarized document that "he possessed the minimum standards for immediate reinstatement of his peace officer's license" (Dkt. #28 at p. 16) (cleaned up). Plaintiffs allege that both acts were in an effort to conceal the knowing, illicit hiring of Deputy Williamson (Dkt. #28 at p. 16). As was the case on October 2, 2019, the Delta County Sheriff's Office attempted once more to submit the records to TCOLE online (Dkt. #28 at pp. 9, 16). And just as before, "TCOLE immediately rejected this attempt because Deputy Williamson still did not possess a valid peace officer's license" nor did he "possess the minimum standards for peace officer licensure" (Dkt.

#28 at p.16) (cleaned up). According to Plaintiffs, despite a second TCOLE notification that Deputy Williamson, in effect, was ineligible to act as a peace officer, Sheriff Smith "did not remove Deputy Williamson from active duty" (Dkt. #28 at p. 17) (cleaned up).

Plaintiffs claim that, on October 28, 2019, the Delta County Sheriff's Office, alongside Deputy Williamson, took a new approach. They "jointly submitted a new application to TCOLE to reactivate and reissue" Deputy Williamson's license (Dkt. #28 at p. 17). Sheriff Singleton followed suit; she drafted a letter addressed to TCOLE which stated that Deputy Williamson "had recently completed his minimum requirements to be licensed" (Dkt. #28 at p. 17).

The scheme that Plaintiffs claim Defendants created began to fall apart. Texas Department of Public Safety Trooper Archie Crittenden ("Trooper Crittenden") learned that Deputy Williamson was policing without an up-to-date peace officer's license (Dkt. #28 at p. 17). Troubled and "deeply disturbed," Trooper Crittenden spoke with JP McCulloch about the matter on November 3, 2019 (Dkt. #28 at p. 17). Citing Taylor's arrest as a particular example, Trooper Crittenden expressed his concerns to JP McCulloch (Dkt. #28 at p. 17). JP McCulloch responded by telling Trooper Crittenden that she intended to confirm the state of Deputy Williamson's license and "promised" to take "immediate" remedial actions if necessary (Dkt. #28 at p. 17).

Accordingly, JP McCulloch ordered Sheriff Smith to appear before her on November 4, 2019 (Dkt. #28 at p. 18). He did (Dkt. #28 at p. 18). When questioned about Deputy Williamson's status, Sheriff Smith stated that "the Delta County Sheriff's Department was already aware" that Deputy Williamson did not have a valid license (Dkt. #28 at p. 18). True to her promise, JP McCulloch told Sheriff Smith that "the JP's office would move to dismiss all of Deputy Williamson's unlawfully issued citations and arrests" (Dkt. #28 at p. 18) (cleaned up). Plaintiffs

10

claim that Sheriff Smith advanced a compromise: do not tell those wrongfully cited or arrested and "all the fines should be paid to Delta County" (Dkt. #28 at p. 18) (cleaned up). JP McCulloch, in response, confronted Sheriff Smith about Taylor's arrest and told him that Taylor "needed to be released . . . immediately" (Dkt. #28 at p. 18). Sheriff Smith saw it differently. He refused (Dkt. #28 at p. 18). Instead, Sheriff Smith told JP McCulloch that he would mention Taylor's case to County Attorney Garrett before doing anything else (Dkt. #28 at p. 18).

Meanwhile, that same day, Trooper Crittenden discussed Deputy Williamson's invalid license with Delta County Judge Murray (Dkt. #28 at p. 18). As he did with JP McCulloch, Trooper Crittenden told Judge Murray that Deputy Williamson "had been unlawfully operating as a deputy without a valid peace officer's license" (Dkt. #28 at p. 18) (cleaned up). Trooper Crittenden thus requested that Judge Murray "work with" Attorney Garrett to fix the situation (Dkt. #28 at pp. 18–19). Namely, Trooper Crittenden recommended that Judge Murray dismiss the citations and criminal charges that Deputy Williamson issued (Dkt. #28 at p. 19). Further, in support of his allegation against Deputy Williamson's eligibility to operate as a peace officer, Trooper Crittenden told Judge Murray that Deputy Williamson's "employment records and data would explicitly confirm [that] Deputy Williamson did not possess an active peace officer's license" (Dkt. #28 at p. 19) (cleaned up). He also told Judge Murray that "the unlawfulness" of Deputy Williamson's conduct "would be readily apparent to anyone that checked the records" (Dkt. #28 at p. 19). Judge Murray, like JP McCulloch, "promised" that he would work alongside Attorney Garrett to fix the damage Deputy Williamson's conduct caused (Dkt. #28 at p. 19).

JP McCulloch later contacted Attorney Garrett that day (Dkt. #28 at p. 19). She confirmed that Attorney Garrett spoke to Sheriff Smith about Deputy Williamson's license and Taylor's arrest

(Dkt. #28 at p. 19). Shockingly, Garrett "refused to condemn the Delta County Sheriff's Office's unlawful employment" of Deputy Williamson (Dkt. #28 at p. 19). Attorney Garrett apparently sought to allay JP McCulloch's concerns by equating Deputy Williamson's arrest of Taylor to a "citizen's arrest" (Dkt. #28 at p. 19) (internal quotations omitted). Attorney Garrett then "refused to take any action" to effectuate Taylor's release (Dkt. #28 at p. 19). Attorney Garrett alerted JP McCulloch that Taylor's arrest constituted a "violation of [Taylor's] probation" (Dkt. #28 at p. 19). JP McCulloch countered that the charges were but an illegitimate product of unlawful law enforcement practices and reaffirmed her belief that Taylor should be released immediately (Dkt. #28 at p. 20). Attorney Garrett rebuffed JP McCulloch's remarks, indicating that the Delta County Attorney's Office would prosecute Taylor and recommend his continued detention in jail until "he was sent to a court-ordered in-patient rehab center" (Dkt. #28 at p. 20).

Unsatisfied, JP McCulloch picked up the pen *sua sponte* and dismissed Deputy Williamson's criminal charges and citations under the jurisdiction of the JP (Dkt. #28 at p. 20). Based on those dismissals, a member of the JP's office "personally called over sixty people" who had been subject to some criminal charge or citation due to Deputy Williamson (Dkt. #28 at p. 20).

Plaintiff alleges that, the next day (November 5, 2019), Sheriff Smith, Attorney Garrett, and Judge Murray convened and "conspired together to utilize whatever tools [available] under their power to cover up" Delta County's unlawful employment of Deputy Williamson (Dkt. #28 at p. 20). In furtherance of that pact, Plaintiffs allege that Attorney Garrett denied Taylor's release and sent Taylor to a rehabilitation center known as the "Texas Dream Center" (Dkt. #28 at p. 20). Neither Attorney Garrett nor his alleged co-conspirators ever informed Taylor that Deputy Williamson lacked a valid license to enforce the law at the time of Taylor's arrest (Dkt. #28 at p.

12

20). All the while, Kerrville State Hospital kept Wiley as a patient (Dkt. #28 at p. 21). Again, none of Defendants contacted Kerrville State Hospital to prompt Wiley's release (Dkt. #28 at p. 21). Nor did any Defendant make any effort to inform Wiley that Deputy Williamson lacked a valid peace officer's license (Dkt. #28 at p. 21).

Plaintiffs claim that, three days later, on November 8, 2019, Sheriff Smith, acting in concert with his co-conspirators, swore Deputy Williamson in *again* (Dkt. #28 at p. 21). Once more, Sheriff Smith, Attorney Garrett, and Sheriff Singleton submitted "falsely certified documentation" to TCOLE (Dkt. #28 at p. 21). This time, with Judge Murray. And this time, the documentation submitted stated that Deputy Williamson "began operating as a Delta County Deputy on November 8, 2019"—more than one month since his first day (Dkt. #28 at pp. 8, 21). Indeed, Deputy Williamson's arrest affidavits, personnel file, and JP office records indicated that he acted as a Delta County Sheriff's deputy starting in early October of 2019 (Dkt. #28 at p. 21). Nonetheless, Deputy Williamson took his oath of office and certified it (Dkt. #28 at p. 21). Defendants submitted the paperwork to TCOLE for approval (Dkt. #28 at p. 21). Plaintiffs also claim that Sheriff Smith "chose to place Deputy Williamson on desk duty" so as to "minimize the liability" that might befall upon Defendant Williamson and Delta County (Dkt. #28 at p. 21).

### E.    The Fallout

According to Plaintiffs, what occurred in the wake of Defendants' decisions is staggering. Wiley—institutionalized due to Defendants' decision to withhold his schizophrenia medication—remained at Kerrville State Hospital from October 20, 2019, until December 18, 2020 (Dkt. #28 at p. 22). Kerrville State Hospital released Wiley only because "he had met all the criteria for release," not because Defendants intervened (Dkt. #28 at p. 22) (internal quotations omitted).

As a result of his arrest and institutionalization, Wiley lost access to his disability benefits (Dkt. #28 at p. 23). Thus, he was unable to afford his mortgage payments (Dkt. #28 at p. 23). That, in turn, forced him to relocate and move in with his mother (Dkt. #28 at p. 23). Wiley was also unable to support his children (Dkt. #28 at p. 23). Finally, he has endured intense emotional pain and suffering due to Defendants' conduct (Dkt. #28 at p. 23).

Taylor faced similar harm. Having been sent to the Texas Dream Center for rehabilitation, Taylor remained there from November 5, 2019, until the last week of February of 2020 (Dkt. #28 at p. 22). Granted, unlike Wiley, Taylor's stint at the Texas Dream Center was arguably voluntary as he elected to enter the program as part of a pretrial diversion program (Dkt. #74 at p. 31). But as Plaintiffs allege, Taylor left the program because "he discovered that the Texas Dream Center had no records of charges against him and that the charges were likely dropped" (Dkt. #28 at p. 22). Soon after he departed the Texas Dream Center, in the fall of 2020, Taylor discovered that the charges against him had not been dropped when he was notified of an upcoming court date (Dkt. #28 at p. 22). Taylor, accompanied by counsel, appeared on January 12, 2021 (Dkt. #28 at p. 22). There, he was informed that his case would be continued (Dkt. #28 at p. 22).

Taylor's counsel discovered that exculpatory evidence relevant to his case—Deputy Williamson's lack of a peace officer's license—had not been turned over (Dkt. #28 at p. 22). That revelation, combined with a subsequent confrontation about it with Attorney Garrett and Judge Murray, led Delta County to drop the charges against Taylor at a hearing in August of 2021 (Dkt. #28 at p. 22). At the hearing, when discussing the undisclosed material—Deputy Williamson's lack of legal authority to arrest Taylor—Attorney Garrett stated that Taylor was "lucky to have such a

14

good attorney, because most lawyers probably wouldn't have found it" (Dkt. #28 at p. 23) (internal quotations omitted).

Though Taylor was no longer at risk of losing his liberty due to criminal charges, the damage was already done. Due to his arrest, he lost his job (Dkt. #28 at p. 23). As a result, his family also lost its main source of income (Dkt. #28 at p. 23). His wife and young children had to leave their home (Dkt. #28 at p. 23). Taylor also suffered "immense emotional pain and suffering" as a result of what occurred at the hands of Defendants (Dkt. #28 at p. 23).

As mentioned, this putative class action seeks to involve many more. According to Plaintiffs, During the period in which Deputy Williamson operated without a valid peace officer's license, he issued at least forty-four sworn citations for traffic violations and failure to maintain financial responsibility (Dkt. #28 at p. 23). Plaintiffs allege that not a single one of the citations' accompanying affidavits include that Deputy Williamson lacked an active peace officers' license (Dkt. #28 at p. 23). Deputy Williamson's issued citations during that time yielded at least $6,700 in citation fines and court costs (Dkt. #28 at p. 23). This litigation followed.

## II.    Procedural Background

Because of Defendants' conduct, Plaintiffs filed suit on October 15, 2021, in the Marshall Division of the Eastern District of Texas (Dkt. #1). Defendants promptly filed two motions. First, Defendants filed their Motion to Change Venue Within District (Dkt. #5). Through it, Defendants sought to secure a transfer to the Sherman Division (Dkt. #5 at p. 2).  Second, Defendants filed their Motion to Dismiss Filed Subject to and Without Waiving Their Motion to Transfer Venue Within District (Dkt. #6). Through it, Defendants sought dismissal because, according to them, the Delta County Sheriff's Office "is not a jural entity and cannot engage in litigation" (Dkt. #6 at p. 1). Judge Rodney Gilstrap granted Defendant's Motion to Transfer Venue (Dkt. #24) and did

not rule on the Defendant's Motion to Dismiss (Dkt. #6). The case was transferred to this Court. The Court then granted Defendants' Motion to Dismiss and accordingly dismissed all claims against Delta County Sheriff's Department with prejudice (Dkt. #27 at pp. 5–6).[5]

Following that decision, Plaintiffs filed their First Amended Class Action Complaint, which is now the live pleading (Dkt. #28). Through it, Plaintiffs assert fifteen claims, all stemming from alleged violations of Plaintiffs' constitutional rights. *See infra* Table 1. Soon after, Plaintiffs filed their Opposed Motion for Class Certification (Dkt. #32). Through it, Plaintiffs sought to certify two classes: (1) "all persons issued citations by [Deputy] Williamson while he operated unlawfully as a Delta County Sheriff's Deputy"; and (2) "all persons arrested or detained and issued criminal charged by [Deputy] Williamson while he operated unlawfully as a Delta County Sheriff's Deputy" (Dkt. #94 at p. 4) (quoting Dkt. #32 at p. 7) (internal quotations omitted).

The Court reserved ruling on the certification question pending further argument by the Parties. On January 9, 2024, the Court ordered Plaintiffs to submit supplemental briefing as to the numerosity and superiority requirements under Federal Rules of Civil Procedure 23(a) and 23(b)(3) (Dkt. #88 at p. 2). Both parties submitted additional briefing (Dkt. #92; Dkt. #93). The Court denied Plaintiff's Motion for Class Certification without prejudice because Plaintiffs were not able to satisfy Rule 23(a)(1)'s numerosity requirement (Dkt. #94 at p. 10). Plaintiffs were free to move the Court to certify a class again, if they desired. They have not.

---

[5] As the Court previously noted in its Memorandum Opinion and Order granting Defendants' Motion (Dkt. #27), Defendants' Motion repeatedly referred to the "Delta County Sheriff's Office" (Dkt. #27 at p. 3 n.1). But the Delta County Sheriff's Office was never—and is not now—a party to this lawsuit (Dkt. #27 at p. 3 n.1). The Court surmised in its previous Order that Defendants alleged that Taylor failed to state a claim against the Delta County Sheriff's Department (the "Department")—a party Taylor actually sued (Dkt. #27 at p. 3 n.3). The Court then dismissed the Department from the case (Dkt. #27 at pp. 3 n.1, 5–6).

Plaintiffs' First Amended Complaint asserts various causes of action against Delta County, Sheriff Smith, Sheriff Singleton, Attorney Garrett, Judge Murray, and Deputy Williams. Plaintiffs' First Amended Complaint brings the following causes of action[6]:

| Count Number | Plaintiff(s) | Defendant(s) | Claim |
|---|---|---|---|
| Count I (Dkt. #28 at p. 25) | All Plaintiffs | Williamson | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Unreasonable Search & Seizure as to the Class |
| Count II (Dkt. #28 at p. 27) | All Plaintiffs | Williamson | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Unlawful Arrest as to the Arrest Subclass |
| Count III (Dkt. #28 at p. 29) | All Plaintiffs | Williamson | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, False Arrest as to the Class |
| Count IV (Dkt. #28 at p. 31) | All Plaintiffs | Williamson | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Malicious Prosecution as to the Class |
| Count V (Dkt. #28 at p. 33) | All Plaintiffs | Williamson | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Unlawful Detention as to the Arrest Subclass |
| Count VI (Dkt. #28 at p. 35) | Patrick Taylor | Williamson | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Excessive Force as to Patrick Taylor individually |
| Count VII (Dkt. #28 at p. 37) | Titus Wiley | Smith, Delta County | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Denial of Basic Human Needs as to Titus Wiley individually |
| Count VIII (Dkt. #28 at p. 39) | All Plaintiffs | Smith, Delta County | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Unlawful Official Hiring Policies as to the Class |
| Count IX (Dkt. #28 at p. 41) | All Plaintiffs | Smith, Delta County, Garrett, Murray | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, False Imprisonment as to the Arrest Subclass |
| Count X (Dkt. #28 at p. 44) | All Plaintiffs | Smith, Delta County, Garrett, Murray | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Malicious Prosecution as to the Class |
| Count XI (Dkt. #28 at p. 47) | All Plaintiffs | Smith, Singleton, Delta County, | Civil Action for Deprivation of Rights, 42 U.S.C. § 1983, Civil Conspiracy as to the Class |

---

[6] This table will hereafter be cited to as "Table 1."

17

| | | Garrett, Murray | |
|---|---|---|---|
| Count XII (Dkt. #28 at p. 51) | All Plaintiffs | All Defendants | Abuse of Process as to the Class |
| Count XIII (Dkt. #28 at p. 52) | All Plaintiffs | Smith, Singleton, Delta County, Garrett, Murray | Malicious Prosecution as to the Class |
| Count XIV (Dkt. #28 at p. 53) | All Plaintiffs | Smith, Singleton, Delta County, Garrett, Murray | Fraud as to the Class |
| Count XV (Dkt. #28 at p. 54) | All Plaintiffs | All Defendants | Intentional Infliction of Emotional Distress as to the Class |

While the Court considered Plaintiffs' Motion to Certify, each Defendant filed a separate Motion for Summary Judgment (Dkt. #56; Dkt. #58; Dkt. #60; Dkt. #62; Dkt. #64; Dkt. #66). Plaintiffs filed their Omnibus Response (Dkt. #74), to which Defendants filed their Omnibus Reply (Dkt. #78). Plaintiffs followed with their Sur-Reply (Dkt. #82).

Relatedly, the Parties filed several evidentiary objections to the summary judgment evidence offered. First, Plaintiffs filed their Objections to Defendants' Summary Judgment Evidence (Dkt. #75). Defendants responded (Dkt. #81) and Plaintiffs replied in turn (Dkt. #89). Defendants also filed their Objection to Plaintiff's Summary Judgment Evidence (Dkt. #79), to which Plaintiffs responded (Dkt. #83), prompting Defendants to reply (Dkt. #86).

Following the filing of the Parties' objections, just before the Court ruled upon Plaintiffs' Motion to Certify, the Parties filed a Joint Motion to Stay Pending the Court's Ruling on Plaintiff's Motion to Certify Class and Defendants' Motions for Summary Judgment on Qualified and Absolute Immunity (Dkt. #90). The Court granted that joint request (Dkt. #91).

While the Court considered the Parties' summary judgment arguments, on November 7, 2024, Plaintiffs filed a Motion for Leave to Amend Complaint (Dkt. #99). Through it, Plaintiffs sought to file another Amended Complaint, which would have added a new defendant and new factual allegations unrelated, both temporally and substantively, to the claims that predominate the cause of action—now fully mature—that arrest the Court's attention (*See* Dkt. #100). Defendants responded in opposition (Dkt. #109), and Plaintiffs replied in further support of their Motion (Dkt. #110). The Court denied Plaintiffs' Motion (Dkt. #113). With all of this background in mind, the Court turns to the summary judgment dispute at hand.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion [for summary judgment]." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of

material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. *See Solomon v. Hous. Corrugated Box Co.*, 526 F.2d 389, 396–97 (5th Cir. 1976). Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

For the most part, each of Defendants' Motions rely on similar evidence, and advance similar bases for summary judgment, all of which the Court explains in great detail in the Sections to come. For now, it is enough to say that Defendants' arguments fall in one of three buckets. The

first involves threshold questions of abstention, statute of limitations, and the viability of Plaintiff's claims under State law. In the second lay Defendants' traditional summary judgment arguments disputing the existence of any material fact. The third and final bucket contains Defendants' arguments that they are immune from either suit or liability under various immunity doctrines. The Court addresses each argument under its respective bucket in turn.

## I.      Threshold Questions

The Court begins with the "threshold questions" bucket. Here, the Court must address several matters underlying the viability of Plaintiffs' suit separate from the merits. Before taking inventory of the threshold issues the Court must address, the posture of this case presents an even more basic question: how to analyze whether the unnamed putative class members' claims should survive summary judgment. Those claims are still live, though Plaintiffs have not moved for class certification after the Court denied its first motion to do so (Dkt. #94). Because the summary judgment record is complete only as to the named Plaintiffs—Taylor and Wiley—the Court proceeds only as to their claims. The Court expressly does not address whether any of the unnamed putative class members' claims should survive summary judgment. Of course, Defendants will reserve the right to file additional summary judgment motions against the unnamed putative class members, should Plaintiffs ultimately obtain class certification. But undoubtedly, the Court's decision here will impact an analysis of those members' claims, should the Court be called upon to conduct it in the future. Accordingly, the Court proceeds only as to Taylor and Wiley's claims, including those that they assert alongside unnamed members. *See supra* Table 1.

Having determined which claims the Court may address at this stage, the Court turns to the more substantive threshold matters. The issues are these: (1) whether Wiley's claims are barred by the *Heck* or *Rooker-Feldman* doctrines; (2) whether Wiley's claims are barred by the statute of

limitations; and (3) whether Plaintiffs' claims based on Texas law are barred by sovereign immunity or do not comply with the Texas Tort Claims Act. We begin with the first.

### A.    Collateral Attack

Defendants argue that one of two doctrines bar Wiley's claims because his claims are collateral attacks on his convictions. The first is based on the Supreme Court's pronouncement in *Heck v. Humphrey*—the *Heck* doctrine, sometimes called the favorable termination rule. Under *Heck*, "it is well settled . . . that a plaintiff who has been convicted of a crime cannot recover damages for an alleged violation of his constitutional rights if that 'violation arose from the same facts attendant to the charge for which he was convicted . . . .'" *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008) (quoting *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994)). This *Heck* bar operates unless the plaintiff proves "'that his conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.'" *Id.* Defendants argue that *Heck* requires dismissal of Wiley's claims (Dkt. #56 at p. 22).[7]

Similarly, all of Defendants argue that the *Rooker-Feldman* doctrine also bars Wiley's claims (Dkt. #56 at p. 22). At a high level, the *Rooker-Feldman* doctrine holds that federal district courts lack subject matter jurisdiction to entertain a collateral attack on a state court judgment. *Price v. Porter*, 351 F. App'x 925, 927 (5th Cir. 2009); *Minor v. State of Texas*, 62 F.3d 395 (5th Cir. 1995); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

---

[7]    Like many arguments in their Motions, Defendants' position with regard to the *Heck* and *Rooker-Feldman* doctrines not only overlap substantially but track each other almost verbatim. For convenience, the Court will only cite to one of Defendants' Motions where appropriate. As to any argument that does not share substantial overlap with another Defendant, the Court will cite the appropriate source accordingly.

If either doctrine applies, the Court will have no choice but to dismiss Wiley's claims. The Court begins with *Heck*.

### 1.    The *Heck* Doctrine

"*Heck* prohibits suit under § 1983 if success on the claim would necessarily imply that a prior conviction or sentence is invalid." *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020) (citing *Heck*, 512 U.S. at 486–87). "*Heck*'s bar extends to convictions obtained through guilty pleas." *Thomas v. Pohlmann*, 681 F. App'x 401, 406 (5th Cir. 2017) (citing *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008)). If the *Heck* bar applies, the plaintiff must show that the prior conviction has been reversed, expunged, declared invalid, or called into question by a writ of habeas corpus. *Id*. (citing *Heck*, 512 U.S. at 486–87). In determining whether § 1983 claims based on conduct intertwined with a plaintiff's criminal conviction should proceed, district courts "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the Plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S at 487. Such a claim is "not cognizable." *Id*. On the other hand, "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed . . . ." *Id*. (emphasis in original). This procedural bar makes sense, given judicial "concern for finality and consistency." *Aucoin*, 958 F.3d at 380. Indeed, the Court would not want to permit "duplicative litigation" or open the door to "conflicting judgments." *Id*. at 382. In its simplest terms, *Heck* guards the well-reasoned notion that "'civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments.'" *Id*. (quoting *Heck*, 512 U.S. at 485–86). Instead, such an attack on prior

proceedings is properly ventilated in "*that* proceeding—not an end-run through § 1983." *Id.* (emphasis in original).

According to Defendants, *Heck* thwarts Wiley's claims at the outset. To anchor that position, Defendants assert that "each of Wiley's claims relies upon his allegation that he was illegally stopped, arrested, and jailed by" Deputy Williamson (Dkt. #56 at p. 23). After he was arrested,[8] JP McCulloch arraigned Wiley, he pleaded guilty, and JP McCulloch accepted the plea (Dkt. #56 at p. 23). Because the JP's file "shows that . . . Wiley's conviction has never been reversed on appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus," *Heck* bars his claims, so Defendants' argument goes (Dkt. #56 at p. 23).

For their part, Plaintiffs disagree. They argue that *Heck* applies on a claim-by-claim basis and requires a "'fact intensive'" inquiry, which Defendants' Motions neglect to perform (Dkt. #74 at p. 65). According to Plaintiffs, in performing that fact-intensive inquiry, it becomes clear that *Heck* does not apply to any of Wiley's claims. Plaintiffs assert that, because several claims are based on Defendants' conduct that occurred *after* the cessation of the conduct underlying Wiley's conviction, *Heck* does not apply to those claims (Dkt. #74 at p. 65). Nor do Wiley's unlawful hiring or arrest claims trigger *Heck*, according to Plaintiffs (Dkt. #74 at p. 65). This argument illustrates Plaintiffs' fundamental position against *Heck*'s application: whether Deputy Williamson acted without lawful authority "would not, on its own, invalidate" Wiley's conviction (Dkt. #74 at p. 66). Defendants maintain that, because Wiley's conviction resulted from the arrest, a finding as to

---

[8] Defendants dispute that Deputy Williamson arrested Wiley at all, arguing that "Deputy Cy Guthrie—[Deputy] Williamson's field training officer—arrested . . . Wiley on October 8, 2019" (Dkt. #56 at p. 23).

Deputy Williamson's ability to make that arrest could invalidate the conviction (Dkt. #78 at p. 11). Therefore, *Heck* must apply, so say Defendants (Dkt. #78 at p. 11). For the most part, the Court agrees with Defendants.

To start, the Court recalls that Wiley pleaded guilty to two charges: (1) disorderly conduct, and (2) driving while license invalid (Dkt. #56-1 at p. 178). These guilty pleas constitute convictions for *Heck* purposes. *See Thomas*, 681 F. App'x at 406. Obvious enough. After all, "a plea of guilty is more than an admission of conduct; it is a conviction." *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). And it is undisputed that Wiley's convictions stand—he has not received a favorable judgment as required to lift the *Heck* bar, should it apply (*See* Dkt. #28; Dkt. #74). *See Bush*, 513 F.3d at 497. Thus, the next—and only remaining—step is to perform the "analytical and fact-intensive" analysis to determine which, if any, of Wiley's claims are barred. *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008). The Court will take Plaintiffs' First Amended Complaint from the top and begin with Wiley's first claim: unreasonable search and seizure.

### a.      *Count I: Unreasonable Search and Seizure*

Wiley's first claim alleges an unreasonable search and seizure under § 1983 (Dkt. #28 at p. 25). According to Plaintiff, the stop of Wiley, along with the attendant search and seizure, violated the Fourth Amendment because Deputy Williamson had no legal authority to perform those law enforcement activities (Dkt. #28 at pp. 25–27). Maybe. But *Heck* bars further consideration of that question as to Wiley. "An unlawful search and seizure claim is predicated on the absence of probable cause and, therefore, would constitute a collateral attack" on Wiley's convictions. *See Moore v. City of Paris Police Dep't*, No. 4:22CV323, 2024 WL 4273610, at *4 (E.D. Tex. Aug. 30, 2024), *report and recommendation adopted sub nom.*, No. 4:22-CV-323, 2024 WL 4269665 (E.D. Tex. Sept. 23, 2024) (citing *Hall v. Lorenz*, 48 F. App'x 481, 481 (5th Cir. 2002) ("Hall's claims

regarding his allegedly illegal arrest and illegal search and seizure, if successful, would undermine the validity of his felony drug conviction."); *Wallace v. Kato*, 549 U.S. 384, 395 n.5 (2007) ("A Fourth Amendment claim can necessarily imply the invalidity of a conviction . . . ."); *Agard v. Sanders*, Civil Action No. 3:06-CV-1129-G, 2006 WL 2128079, at *3 (N.D. Tex. July 31, 2006) (finding that the plaintiff's unlawful traffic stop claim would, if proved, implicate the validity of his guilty plea because the evidence discovered following the stop would be subject to suppression)). Plaintiffs do not appear to try to make any specific argument to the contrary (*See* Dkt. #74 at pp. 65–66). Because success on Count I is necessarily inconsistent with leaving Wiley's criminal conviction undisturbed, *Heck* mandates dismissal of that claim as to Wiley.

### b.    Counts II & III: Unlawful and False Arrest

Through Counts II and III, Wiley challenges his arrest conducted by Deputy Williamson (Dkt. #28 at pp. 27–31). Plaintiffs do not appear to mount any meaningful defense against *Heck*'s application (*See* Dkt. #74 at pp. 65–66). Instead, Plaintiffs suggest that this case "does not necessarily implicate *Heck*" because the lawsuit "does not dispute the elements of [Wiley's] conviction," but instead "concerns whether an unlicensed peace officer . . . may arrest and detain an individual and then falsely state on the arrest affidavit that he is the peace officer" (Dkt. #74 at p. 66). In support, Plaintiff cites *Mackey v. Dickinson* for the proposition that "'a claim of unlawful arrest, standing alone, does not necessarily implicate the validity of a criminal prosecution following the arrest'" (Dkt. #74 at p. 66) (quoting 47 F.3d 744, 746 (5th Cir. 1995)). But *Mackey* involved a "confusing" *pro se* complaint and an ongoing criminal action in which it was not clear whether the plaintiff had been tried or convicted yet. *Mackey*, 47 F.3d at 746. That is not the case here. It is undisputed that Wiley was convicted after pleading guilty to two misdemeanors (Dkt. #66-1 at pp. 125, 178). And while Plaintiffs maintain that Wiley does not challenge his convictions,

that fact is irrelevant. "'It is irrelevant that a plaintiff disclaims any intention of challenging his conviction; if he makes allegations that are inconsistent with the conviction's having been valid, *Heck* kicks in and bars his civil suit.'" *Aucoin*, 958 F.3d at 383 (quoting *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003)).

Here, allowing Wiley to proceed on any claim contesting law enforcement's ability to arrest him necessarily implicates the validity of his convictions. *See Phillips v. Cnty. of Smith*, No. 6:24-CV-00095, 2024 WL 3620312, at *2 (E.D. Tex. July 31, 2024) ("If any basis for the arrest has resulted in a conviction, any unlawful arrest claim predicated on that arrest is barred by *Heck*"). And while Plaintiffs suggest that *Heck* may not necessarily be implicated here, they do nothing to carry their burden to show how. Because Wiley's conviction would be called into question by success on Counts II or III in Plaintiffs' Complaint, those claims are also *Heck*-barred as to Wiley.

c.    *Counts IV & X: Malicious Prosecution*

Wiley's malicious prosecution claim under Counts IV and X are similarly barred (*See* Dkt. #28 at p. 31). Plaintiffs' argument to the contrary seems to be simply that because it happened after Wiley actually committed criminal offenses, *Heck* "is not implicated as a matter of law" (Dkt. #74 at p. 65). That argument overemphasizes the role of time in a *Heck* inquiry. The Fifth Circuit has long applied *Heck* to bar malicious prosecution claims. *See, e.g.*, *Cormier v. Lafayette City-Par. Consol. Gov't*, 493 F. App'x 578, 583 (5th Cir. 2012) (citing *Wells v. Bonner*, 45 F.3d 90, 94–96 (5th Cir. 1995) (We have specifically noted that false-arrest and malicious-prosecution claims challenge the existence of probable cause and, thus, by their essence are collateral attacks on a criminal judgment's validity.")). By their very nature, prosecutions happen after a defendant stops performing the unlawful act that gave rise to the charge in the first place (*Cf.* Dkt. #74 at p. 65). Taking Plaintiffs' argument to its logical extension would render *Heck* toothless; all convicted

27

defendants could collaterally attack their convictions so long as they come up with something that went wrong *after* they submitted to law enforcement. Plaintiffs do not provide precedent to justify that view. The reality is, if Wiley were to succeed on his malicious prosecution claim—particularly on this theory that, essentially, he never should have been prosecuted in the first place—his conviction would necessarily be called into question. Accordingly, *Heck* bars Wiley's malicious prosecution claim. *See Heck*, 512 U.S. at 484; *Pete v. Metcalfe*, 8 F.3d 214, 219 (5th Cir. 1993) ("[Plaintiff] fails to state a claim for malicious prosecution because his prosecution ended with a plea of *nolo contendere* and resulting conviction and thus the action did not terminate in his favor. This bars any action for malicious prosecution."); *Perkins v. City of Garland Police Dep't*, No. 3:13-CV-2022-B, 2013 WL 5490047, at *4 (N.D. Tex. Oct. 2, 2013) ("The *Heck* bar applies to claims of malicious prosecution and false arrest.").

### d.    *Count V: Unlawful Detention*

In Count V, Wiley brings a claim for unlawful detention, which *Heck* kicks out (Dkt. #28 at p. 33). The language in Plaintiffs Complaint explains why. It states: "[l]iability arises in this context when a person is subjected to pretrial detention based upon a legal process that goes wrong, such as when a judge's probable cause or criminal determination is predicated solely on the officer's false statements, or an arrest initiated without legal justification" (Dkt. #28 at p. 33) (citations omitted) (cleaned up). Because Plaintiff's theory is that he never should have been detained because "something went wrong with the legal process"—i.e., Deputy Williamson's licensure and JP McCulloch's subsequent actions in reliance on Deputy Williamson's statements—success on that theory here would necessarily stain Wiley's conviction. Accordingly, Wiley's unlawful detention claim is *Heck*-barred, too. *See Allen v. City of Clarksdale*, 54 F. App'x 591 (5th Cir. 2002) (stating that "[plaintiff's] illegal confinement and imprisonment claims call into question her

28

underlying criminal convictions" and holding them *Heck*-barred absent showing that her conviction was reversed, expunged, or invalidated); *Ray v. Collin Cnty. Sheriff's Off.*, No. 4:20CV856, 2022 WL 18674951, at *5 (E.D. Tex. Nov. 21, 2022), *report and recommendation adopted*, No. 4:20CV856, 2023 WL 1971307 (E.D. Tex. Feb. 13, 2023) ("[A]ny claims concerning unlawful detainer, unlawful arrest, and false imprisonment are barred by *Heck* and should be dismissed until the *Heck* conditions are met.").

     *e.*  *Counts VIII & XI: Unlawful Official Hiring Policies & Civil Conspiracy*

   In Count VIII, Plaintiffs plead a claim for unlawful official hiring policies against Sheriff Smith and Delta County for hiring Deputy Williamson in the first place. Count XI charges Defendants with conspiring to cover up those policies. According to Wiley, *Heck* does not bar this claim as to him because "a finding that [Sheriff] Smith was deliberately indifferent to Plaintiffs' constitutional rights when he hired [Deputy] Williamson would not require negation of an element of the criminal offense for which . . . Wiley was convicted" (Dkt. #74 at p. 65). But still, Plaintiffs' argument misses the point. To succeed on that claim, Wiley would need to show that Sheriff Smith and Delta County violated his rights. The rights that Wiley claims both Defendants violated are inextricably linked with his criminal prosecution. Success on his claim "would necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S at 487. If Sheriff Smith and Delta County violated Wiley's rights by hiring Deputy Williamson, it is only because Deputy Williamson, according to Wiley, subjected him to the criminal process without lawful authority. To permit Wiley to pursue this claim would be to work an end-run around *Heck* and the Court's decisions above. *Heck* demands otherwise. Accordingly, these claims are also barred as to Wiley (Dkt. #28 at p. 41).

*f.    Count IX: False Imprisonment*

In Count IX, Wiley asserts that his incarceration was unconstitutional under the Due Process Clause of the Fourteenth Amendment because Deputy Williamson lacked authority to initiate the criminal process under Texas law and for continuing his incarceration in the face of alleged exculpatory evidence (Dkt. #28 at p. 42). "Claims of false arrest, false imprisonment, and malicious prosecution involve the guarantees of the Fourth and Fourteenth Amendments when the individual complains of an arrest, detention, and prosecution without probable cause." *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988). The Fifth Circuit has "held only that the due process clause is implicated in cases of continued incarceration without an initial appearance, or after charges are dropped, or beyond the term of a court-ordered sentence, or in the face of exculpatory evidence." *Terry v. Hubert*, 609 F.3d 757, 763 (5th Cir. 2010) (citing *Jones v. City of Jackson*, 203 F.3d 875, 880–81 (5th Cir. 2000); *Brooks v. George Cnty., Miss.*, 84 F.3d 157, 166 (5th Cir. 1996); *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980); *Sanders v. English*, 950 F.2d 1152, 1159 (5th Cir. 1992)). Wiley's claim seems to be based on the last two theories. A false imprisonment claim, at its core, requires a showing of arrest absent probable cause. *Allen v. Jackson Cnty., Miss.*, 623 F. App'x 161, 162 (5th Cir. 2015) (citing *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004)). Here, the alleged exculpatory evidence is only Deputy Williamson's allegedly defective license. Because proving his arrest and conviction lacked probable cause would contradict his conviction, this claim is barred by *Heck*. *See Heck*, 512 U.S at 487. The same is true to the extent that his claim is based on continued detention, because the root of a "continued detention" is an initial detention, which can only be precipitated by probable cause. For that reason, Count IX should be dismissed under *Heck*.

g.    *Count VII: Denial of Basic Human Needs*

Though, as explained above, the vast majority of Wiley's claims are *Heck*-barred, one is not: his claim for denial of basic human needs as set out in Count VII (Dkt. #28 at p. 37). That claim is wholly distinct from Wiley's underlying convictions and law enforcement's involvement in precipitating those convictions. This claim stands on its own legal island—the Eighth Amendment. Specifically, Wiley claims that Sheriff Smith and Delta County violated the Eighth Amendment when they acted with deliberate indifference toward his serious medical needs while serving his sentence (Dkt. #28 at p. 37). Success on that claim will in no way, shape, or form, call his convictions into question. That claim is not barred by *Heck*. Just as *Heck* "does not bar a § 1983 claim for a prison guard's excessive use of force *after* the inmate has submitted and ceased engaging in the alleged misconduct[,]" *Heck* does not bar an Eighth Amendment Claim that did not even begin to occur until after Wiley was convicted. *See Aucoin*, 958 F.3d at 380.

In sum, all but Wiley's Eighth Amendment claim are barred by *Heck*. As the Fifth Circuit has stated before, "when a plaintiff's claim 'is based solely on his assertions that he . . . did nothing wrong and was attacked by the officers for no reason,' that suit 'squarely challenges the factual determination that underlies his conviction.'" *Id.* (quoting *Walker v. Munsell*, 281 F. App'x 388, 390 (5th Cir. 2008)). "It is precisely this 'type of claim that is barred by *Heck* in our circuit.'" *Id.* (quoting *Walker*, 281 F. App'x at 390). And while the Fifth Circuit articulated this broad principle in the context of excessive use of force cases, the principle applies here just the same. Though, here, the unique facts of this case make it hard to imagine that Wiley cannot seek redress against what is alleged to have been a patently unlawful arrest simply because he pleaded guilty, *Heck*

appears to demand it. Plaintiffs have not provided the Court with any reason to hold differently.[9] Indeed, by pleading guilty, Wiley waived his right to challenge the vast majority of matters upon which he now bases civil claims. *Heck* will not allow Wiley to cast doubt on his conviction through § 1983. Accordingly, Count I, II, III, IV, V, VIII, IX, X, and XI are dismissed with prejudice "until the *Heck* conditions are met" as to Wiley.[10] Only his Eighth Amendment claim survives.[11]

### 2.  *Rooker-Feldman*

Application of *Heck* takes the wind out of the sails of Defendants' alternative *Rooker-Feldman* arguments. In just a few short sentences, Defendants claim that because *Rooker-Feldman* holds that the Court lacks jurisdiction to entertain collateral attacks, and because Wiley's convictions have not been appealed, he may not attack his convictions via this § 1983 suit (Dkt. #56 at p. 23). Wiley's only remaining claims are under the Eighth and Fourteenth Amendments. *See supra* I.A.1. Defendants' Motions do not raise any legitimate argument that these claims constitute collateral attacks that the Court cannot entertain under *Rooker-Feldman* (*See, e.g.*, Dkt. #56). Nor does the Court discern one. Accordingly, the Court need not address Defendants' arguments further on this point.

---

[9]  In attempting to ward off *Heck*'s broad reach, Plaintiffs note that "Wiley is not in custody and has no recourse to challenge his conviction through habeas petition." That practical reality aside, the Fifth Circuit has squarely rejected that argument. *See, e.g.*, *Ahmadi v. Davis*, 806 F. App'x 329, 330 (5th Cir. 2020) ("[Plaintiff] incorrectly argues that, because he no longer has the habeas remedy available to him, his § 1983 complaint is not subject to the favorable-termination requirement in *Heck*.").

[10]  *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996) (noting that the proper order of dismissal is with prejudice "until the *Heck* conditions are met"); *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 657 (5th Cir. 2007) (modifying judgment of district court in accordance with *Johnson*).

[11]  The Court does not address Counts XII, XIII, XIV, and XV under this Section because, as explained *infra* in Section I.C., Wiley, like all Plaintiffs, has abandoned those state-law claims.

## B.    Statute of Limitations

The Court now turns to the second bucket: the statute of limitations. Defendants argue that all of Wiley's claims (now, his only remaining claim) are barred by limitations (Dkt. #56 at p. 23). According to Defendants, because Wiley was arrested on October 8, 2019, and Plaintiffs did not initiate the action until October 15, 2021, his claims are barred by the applicable two-year limitations period (Dkt. #56 at p. 24).[12] *See Price v. City of San Antonio*, 431 F.3d 890. 892 (5th Cir. 2005) (noting that the statute of limitations on a § 1983 claim in Texas is two years). For their part, Plaintiffs claim that Defendants' calculation—and therefore their conclusion—erroneously supposes that Wiley's constitutional claims accrued at the time of his arrest on October 8, 2019 (Dkt. #74 at p. 67). According to Plaintiffs, under the discovery rule, "Wiley's claims accrued the moment he became aware or had sufficient information to understand he suffered an injury" (Dkt. #74 at p. 68). But as to the claims addressed above, none of this back-and-forth matters, given the foregoing analysis.

What does matter is whether the statute of limitations bars Wiley's claims under the Eighth and Fourteenth Amendments. Defendants concede that claims "based on conduct on or after October 15, 2019, are timely" (Dkt. #74 at p. 68; Dkt. #62 at p. 27). During that time, Wiley was still in Delta County custody without access to his schizophrenia medication (Dkt. #74 at p. 68; Dkt. #78). Seemingly, Defendants argue that Wiley's Eighth Amendment claim accrued either when he was examined on October 10, 2019, or when he began being offered antipsychotic

---

[12] The United States Supreme Court held in *American Pipe* that "the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint." *China Agritech v. Michael H. Resh*, 584 U.S. 732, 735 (2018) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)). Defendants' response seeks to stave off Plaintiffs' use of *American Pipe*, arguing that that tolling doctrine "does not apply to claims which were time-barred when the class action was filed" (Dkt. #56 at p. 24). Because Wiley's claims were time-barred when the action was filed, Defendants argue that *American Pipe* grants him no solace here (Dkt. #56 at p. 24). But because the Court concludes that Wiley's only remaining claim—which is only brought on his own behalf—is timely, the Court need not proceed any further with Defendants' alternative argument concerning *American Pipe* tolling.

medications on October 12, 2019 (Dkt. #62 at p. 27). Therefore, according to Defendants, Wiley's claims, brought on October 15, 2021, are barred as untimely.

While state law determines the length of the limitations period on § 1983 claims, district courts must look to federal law to determine the accrual date. *Walker v. Epps*, 5509 F.3d 407, 414 (5th Cir. 2008) ("We determine the accrual date of a § 1983 action by reference to federal law."). The statutory period begins to run "when the plaintiff has reason to know of the injury which is the basis of the action." *Gonzales v. Wyatt*, 157 F.3d 1016, 1020 (5th Cir. 1998) (citing *Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989)). Here, there is a meaningful dispute over the date that Wiley's claim accrued, and Defendants are not able to show on which day—while he was in their custody and allegedly undergoing a psychotic episode—Wiley could have become aware of a violation (*See* Dkt. #62 at p. 27). But Wiley was released from Delta County's custody on October 24, 2019, and placed in the custody of the Kerrville State Hospital (Dkt. #62 at p. 17) (citing Dkt. #62-1 at pp. 122–24). Because it is Defendants' burden to show that the action is time-barred, and because a meaningful dispute remains as to the accrual date, the Court assumes for purposes of this Order that Wiley's claim is not time-barred. *See Gonzales v. Wyatt*, 157 F.3d 1016, 1020 (5th Cir. 1998) ("It is the defendant's burden to establish the affirmative defense of limitation, including the accrual date of the plaintiff's claims.").

## C.    State Law Claims (Counts XII, XIII, XIV, & XV)

With that, the Court turns to the final threshold matter: the viability of Plaintiff's state-law claims. That is, Counts XII (Abuse of Process), XIII (Malicious Prosecution), XIV (Fraud), and XV

(Intentional Infliction of Emotional Distress) (Dkt. #28 at pp. 47–54).[13] Defendants' Motions raise a host of reasons they should be dismissed, some more weighty than others. Namely, Defendants argue that these claims under Texas law must have been brought under the Texas Tort Claims Act ("TTCA") (Dkt. #56 at p. 38). And under the TTCA, Defendants claim that Plaintiffs' claims fail for three reasons, each of which is an independent basis for the Court to dismiss each claim. Defendants argue that dismissal is proper for three reasons. First, Plaintiffs did not tender proper notice in accordance with the TTCA (Dkt. #56 at. p. 38). Second, Plaintiffs' attempt to sue both Delta County and the individual Defendants runs afoul of the TTCA's election-of-remedies provision, which requires that a plaintiff assert claims against either the governmental unit *or* its employees, but not both (Dkt. #56 at p. 38). According to Defendants, at this stage, the individual claims must be dismissed as a matter of Texas statute because Plaintiffs' decision to file suit against Delta County is irrevocable (Dkt. #56 at pp. 38–39). Third and finally, Defendants argue that Plaintiffs' claims are barred by sovereign immunity (Dkt. #56 at pp. 39–40). That is because the TTCA does not waive sovereign immunity for intentional torts like abuse of process, malicious prosecution, fraud, and intentional infliction of emotional distress (Dkt. #56 at p. 40). In response, Plaintiffs offer less than a whisper—nothing. Neither in Plaintiffs' Response nor in their Sur-Reply do they offer a word in defense of their claims.

Plaintiffs' state-law claims, are, therefore, deemed abandoned. It is settled that, "[w]hen a plaintiff fails to defend a claim in response to a . . . summary judgment motion, the claim is deemed abandoned." *Arias v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00418-L, 2019 WL 2770160, at *2 (N.D.

---

[13] While Plaintiffs' First Amended Complaint does not say that Counts XII–XV are brought under Texas law, Plaintiffs do not dispute Defendants' characterization of those Counts as such (*See* Dkt. #74). No less, it is clear to the Court that these claims are brought under Texas law. As Table 1 indicates, they do not purport to be brought under § 1983.

Tex. July 2, 2019) (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983)); *Bills v. Wal-Mart Stores E. LP*, No. 4:21-CV-00024, 2022 WL 389915, at *10 (E.D. Tex. Feb. 8, 2022) (citing *Arias*, 2019 WL 2770160, at *2). Accordingly, Counts XII, XIII, XIV, and XV are deemed abandoned and, therefore, are dismissed. *See id.*

## II.    Summary Judgment Record

Having separated the wheat from the chaff, the Court turns to its second task: determining whether any fact issue exists on any remaining claim such that Plaintiffs' claims survive summary judgment. As explained below, the answer is no. Taylor's Fourth Amendment claims should be dismissed because the Fourth Amendment does not incorporate state law enforcement licensing requirements. Taylor's excessive force claim fails because the force used against him was not objectively unreasonable. Wiley's Eighth Amendment claim fails because he cannot show a violation occurred. The remaining claims for conspiracy and municipal liability also fail for want of an underlying constitutional violation. And finally, the Court concludes that, even if the summary judgment record did support that notion that a constitutional violation occurred, immunity would still bar Plaintiffs' claims. Accordingly, Plaintiffs' claims should be dismissed.

### A.    Evidentiary Objections

Before turning to the summary judgment merits, the Court must briefly address the evidentiary objections the Parties' raise (*See* Dkt. #75; Dkt. #79). The analysis the Court undertakes in this Order is almost entirely legal. The objections to the evidence before the Court— which largely comprise of declarations and affidavits—do not alter the inquiries the Court performs here. But, to the extent that the Court does rely on particular evidence that was the subject of any objection, that objection is overruled.

**B.      Merits**

As to the merits, as mentioned, Defendants claim entitlement to qualified immunity. To establish § 1983 liability, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Public officials whose positions entail the exercise of discretion may be protected by the defense of qualified immunity from personal liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant asserts the defense of qualified immunity and has established that the alleged actions were conducted pursuant to the exercise of his discretionary authority, the burden then shifts to the plaintiff to rebut this defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

Courts have historically conducted a two-pronged analysis to determine whether a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court must determine whether a "constitutional right would have been violated on the facts alleged." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004). Second, if a constitutional right was violated, a court then determines whether "the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The law may be deemed to be clearly established if a reasonable official would understand that his conduct violates the asserted right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The official's subjective motivation is irrelevant to the qualified immunity defense except as far as it is relevant to the underlying constitutional claim. *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). A government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of the right [are] sufficiently clear" such that every "reasonable official would have understood that what he is doing violates that right." *Creighton,* 483 U.S. at 640. The clearly

established inquiry does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *See id.*; *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Supreme Court instructs courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009). Here, the Court exercises its discretion to address the threshold question of whether a violation occurred first. Then, the Court asks whether the clearly established prong is met.

### 1.    Counts I & II: Unreasonable Search, Seizure, and Unlawful Arrest

The lynchpin of this lawsuit is the alleged invalidity of Deputy Williams's peace officer's license. Counts I (Unreasonable Search and Seizure) and II (Unlawful Arrest) both hinge on the truth of one legal theory: any search or seizure conducted by, or any arrest or detention as a result of, a law enforcement officer whose state-issued peace officer's license expired is *per se* unconstitutional under the Fourth Amendment. The Parties have not found, and the Court is not aware of, any authority that addresses this question. But at first blush, this theory appears palatable. One could argue that the Fourth Amendment presupposes that an unlicensed law enforcement officer cannot enforce the law.

That would make logical sense. Practically speaking, the Fourth Amendment conjures images of sirens, uniforms, badges, and guns by default. That is not unfounded. The vast majority of Fourth Amendment jurisprudence, unsurprisingly, contemplates what law enforcement officers may or may not do within the confines of our Constitution. So, it is reasonable to assume that, when the Fourth Amendment is applied to law enforcement officers, the discussion includes only *licensed* police officers. But it is well settled that the Fourth Amendment reaches far more than peace officers. *Campbell v. McAlister*, 162 F.3d 94 (5th Cir. 1998) (citing *New Jersey v. T.L.O.*, 469 U.S. 325

(1985) ("[T]he [Supreme] Court has made clear that the scope of the Fourth Amendment is not limited to criminal investigations, but rather, extends generally to searches and seizures by government actors."). Indeed, the text of the Fourth Amendment makes no mention of police officers, much less those holding a valid license. Because there is no federal constitutional right demanding that each peace officer maintain a valid, state-sanctioned law enforcement license, Plaintiffs' claims based on the lapse of Deputy Williamson's license must be dismissed. But first, the Parties' arguments.

The Court turns first to Taylor's claim under the Fourth Amendment for unreasonable search and seizure (Dkt. #28 at p. 25). Holding aside qualified immunity, to prevail on this claim, Taylor must show that he was subject to an unreasonable search or seizure." U.S. CONST. amend. IV; *Perry v. N. Hopkins Indep. Sch. Dist.*, No. 4:17-CV-236, 2019 WL 3818742, at *4 (E.D. Tex. Aug. 14, 2019). If either is established, the Court must then evaluate the reasonableness of the search or seizure "under the Fourth Amendment's 'objective reasonableness' standard," which "'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Graham v. Connor*, 490 U.S. 386, 386 (1989); *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (quoting *Graham*, 490 U.S. at 396)).

It is undisputed that Deputy Williamson stopped and arrested Taylor. It is also undisputed that during this time, Deputy Williamson operated as a Delta County Sheriff's Deputy. As Deputy Williamson's Motion identifies, Taylor's claim is based on the fact that, at the time of the stop, Deputy Williamson "did not possess lawful authority to act as a law enforcement officer under Texas law" (Dkt. #64 at p. 23) (internal quotations omitted). According to Deputy Williamson, that fact is irrelevant because the summary judgment record "shows that an officer would have

[had] reasonable suspicion to pull . . . Taylor over upon seeing him driving ten miles over the posted speed limit" (Dkt. #64 at p. 24). Similarly, Deputy Williamson argues that his subsequent seizure of Taylor is unremarkable because any "licensed officer would have the authority to arrest [Taylor] considering his intoxication and physical resistance" (Dkt. #64 at p. 24). Finally, Deputy Williamson argues that summary judgment is proper even if his lack of a valid peace officer's license is consequential because "causation was broken" (Dkt. #64 at p. 24). That is because "Deputy Robinson—a fully licensed law enforcement officer observed . . . Taylor's public intoxication and resistance to arrest, and he participated in the arrest" (Dkt. #64 at p. 24). In other words, because Deputy Williamson—who wore a badge but only had authority to act as a citizen—did not act alone, Taylor has no claim (*See* Dkt. #64 at p. 24).

Unsurprisingly, Taylor sees it differently. According to him, "whether there was probable cause is irrelevant if [Deputy] Williamson did not have the authority to make the arrest" (Dkt. #74 at p. 38). Axiomatic though it may be, Taylor's argument recalls that a "'law enforcement officer can make a warrantless arrest only if a federal or state law imbues him with that authority'" (Dkt. #74 at p. 38) (quoting *United States v. Sealed Juvenile 1*, 255 F.3d 213, 216 (5th Cir. 2001)). If Deputy Williamson did not have authority to stop or seize Taylor, then a violation has occurred, plain and simple, so the argument goes. Because Deputy Williamson lacked a peace officer's license, he only had authority to conduct Fourth Amendment activities if the law would have permitted him to make a citizen's arrest (Dkt. #74 at p. 39). According to Taylor, he did not. The offenses of arrest (driving without a license, disorderly conduct, resisting arrest, and driving while intoxicated), do not permit a citizen's arrest under the circumstances this case presents, so says Taylor (Dkt. #74 at pp. 40–41). Thus, a violation occurred, he persists.

The Parties' arguments related to Taylor's Fourth Amendment claim for unlawful arrest fall along similar lines. Defendants argue that dismissal is appropriate because probable cause justified the arrest independent of Deputy Williamson's license and because another licensed officer assisted Deputy Williamson's arrest of Taylor (Dkt. #64 at p. 25). Plaintiffs appear to hold firm that arrest was unlawful because Deputy Williamson's license was invalid (*See* Dkt. #74 at pp. 41–42).

Defendants are correct—Plaintiff cannot maintain a § 1983 claim for unreasonable search and seizure or unlawful arrest, though not exactly for the reasons they submit. Dismissal of these claims is proper because the Fourth Amendment does not guarantee all Fourth Amendment activity will be conducted by a peace officer with a valid state issued peace officer's license. The Fourth Amendment to the United States Constitution is the heart of the dispute. So, it is fitting, as usual, to return to its text. It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend IV. Counts I, II, and III are premised on the notion that these words render unconstitutional Fourth Amendment activities performed by a state law enforcement officer's conduct because his state mandated peace officer's license lapsed. They do not.

At the same time, however, Texas law demands that a peace officer hold a valid license. "To be a peace officer in the State of Texas, an individual must . . . be licensed by the [TCOLE] . . . ." *Cleveland v. City of Elmendorf, Tex.*, 388 F.3d 522, 529 (5th Cir. 2004); TEX. CRIM. PROC. CODE ANN. § 2.12 (defining peace officers as those licensed under the Texas Occupations Code); TEX. OCC. CODE ANN. § 1701.159 (requiring active license to serve as a peace officer). Plaintiffs allege

that, since Deputy Williams did not possess an active license at the time he stopped and arrested Taylor, Taylor's Fourth Amendment rights have been violated. Not so.

The Parties have not directed the Court to any cases in this Circuit (or from another, for that matter) in which a court has squarely address the question of whether a search or seizure conducted by an unlicensed law enforcement officer violates the Federal Constitution. As Defendants note, "a thorough search of case law in the Fifth Circuit has not revealed any cases discussing § 1983 claims against peace officers who are not licensed" (Dkt. #64 at p. 24). Taylor does not rebut that position (*See* Dkt. #74). Indeed, to the Court's knowledge, there is no existing analog to this case. But the Parties' arguments (all of which center around Texas law) erroneously assume that, in the eyes of the Fourth Amendment, Deputy Williamson's license matters. Assuming that Deputy Williamson lacked the authority under Texas statute to act as a peace officer, Plaintiff has failed to vault a critical legal hurdle: "In order to obtain relief under § 1983, a plaintiff must prove that he was deprived of a constitutional right or federal statutory right and that the persons depriving him of that right acted under color of law." *Biliski v. Harborth*, 55 F.3d 160, 162 (5th Cir. 1995) (citing *Hernandez v. Maxwell*, 905 F.2d 94, 95 (5th Cir. 1990)).

The Court must be careful to hold the line between that which state law protects, and that which the Constitution guarantees. Courts have, in the face of § 1983 claims against illegally appointed or hired law enforcement officers, recognized this crucial distinction. *See, e.g.*, *Johnson v. Pottawotomie Tribal Police Dep't*, 411 F. App'x 195, 201 (10th Cir. 2011) (affirming dismissal of inmate's § 1983 claims regarding hiring and employment of law enforcement officers under Kansas law because such allegations do not give rise to a cognizable constitutional violation); *Malone v. Cnty. of Suffolk*, 968 F.2d 1480, 1482–83 (2d Cir. 1992) (applying state law to determine the status

of law enforcement officers to determine whether that impacts the constitutionality of a § 1983 plaintiff's arrest). Section 1983 is a vehicle to vindicate violations of federal rights, not state statutory ones. *Biliski*, 55 F.3d at 162. And so, the question is, whether Taylor's claims are based on a violation of federal rights. They are not.

As explained below, Plaintiff's causes of action are based on alleged noncompliance with state law—not federal law. In *Virginia v. Moore*, the Supreme Court reaffirmed "what [it] had signaled for more than half a century." 553 U.S. 164, 178 (2008). That is, "it is not the province of the Fourth Amendment to enforce state law." *Id.* "When officers have probable cause to believe that a person committed a crime in their presence, the Fourth Amendment permits them to make an arrest and to search the suspect to in order to safeguard evidence and ensure their own safety." *Id.* A "novel challenge" involving the Fourth Amendment's interaction with a Virginia statute prompted this conclusion. *Id.* Namely, officers arrested an individual for the misdemeanor charge of driving on a suspended license, though Virginia law required them to issue the plaintiff a summons rather than arresting him. *Id.* at 167. Then, officers searched him incident to that arrest, finding drugs in his possession. *Id.* He was charged for that possession and sought to suppress the evidence under the Fourth Amendment as illegally seized because Virginia law did not authorize his arrest and its attendant search. *Id.* The Virginia Supreme Court held that the evidence should have been suppressed, reasoning "that since the arresting officers should have issued [the defendant] a citation under state law, and the Fourth Amendment does not permit search incident to citation, the arrest search violated the Fourth Amendment." *Id.* The Supreme Court reversed.

In doing so, the Court asked the fundamental Fourth Amendment question: whether the search or seizure was unreasonable. *Id.* at 168. In answering that question, the Court turned first to

history. *Id*. It noted the absence of any "historical indication that those who ratified the Fourth Amendment understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted." *Id*. The Court continued to analyze the reasonableness of the search and seizure "in light of traditional standards of reasonableness 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id*. at 169. (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Focusing exclusively on whether probable cause existed to justify the search, the Court noted that, "[i]n a long line of cases, [it] has said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is *constitutionally* reasonable." *Id*. (emphasis added). Any additional protection, the Court has treated as "exclusively" the province of state law. *Id*. The same holds true in the context of Fourth Amendment seizures. *Id*. at 172. A seizure that is grounded in probable cause, though it may violate state regulations, does not a constitutional claim make. *Id*. (citing *Whren v. United States*, 517 U.S. 806 (1996)). Indeed, the Court "thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule." *Id*. Thus, there, Virginia law did not add to the settled Fourth Amendment formula for analyzing the reasonableness of a search or seizure. *See id*. at 173–75. Because "the arrest rules that the officers violated were those of state law alone, and as [the Court] . . . concluded, it is not the province of the Fourth Amendment to enforce state law[,]" the Court reversed the judgment of the Supreme Court of Virginia. *Id*. at 178. Thus, if Deputy Williamson's licensure status violated Texas law, that does not render Taylor's arrest, search, and prosecution invalid as a matter of Federal law. *See id*.

Taylor notes, and Defendants do not seem to dispute, that "[a] 'law enforcement officer can make a warrantless arrest *only* if a federal or state law imbues him with that authority'" (Dkt. #74 at p. 38) (emphasis in original). Taylor thus argues, per that mandate, that his § 1983 claim must survive because neither a state nor federal law gave Deputy Williamson the authority to make a warrantless arrest, let alone an arrest at all (*See* Dkt. #74 at p. 38). Plaintiff does not suggest that Defendants violated a federal statute—just the Federal Constitution via their decision to flout Texas's licensure requirements for peace officers (*See* Dkt. #74 at pp. 38–41). As the Supreme Court repeated in *Moore*, arrests with warrants and those without alike must be judged according to state law. *Id*. at 172. But that rule is not divined from the Constitution. *Id*. The *only* thing supporting Plaintiffs' claims is an alleged violation of state law. That will not suffice, as none of Taylor's § 1983 claims are proper vehicles for asserting a violation of Texas law.

Any other conclusion threatens to stretch the fabric of the Fourth Amendment and § 1983 far past their tensile strength. Law enforcement licensure requirements, as matters of state law, "'vary from place to place and from time to time,'" as all state law does, but "Fourth Amendment protections are not 'so variable' and cannot 'be made to turn upon such trivialities.'" *Moore*, 553 U.S. at 172 (quoting *Wren*, 517 U.S. at 815). Permitting Taylor's claims based on Deputy Williamson's licensure to proceed would link the Fourth Amendment to Texas law. But "linking Fourth Amendment protections to state law" would allow state law to dictate the contours of the Fourth Amendment based on border lines and the will of state legislatures. *See id*. at 176. That cannot be the case. *See id*.

This binding precedent aside, a consequentialist approach to Taylor's theory bolsters the same conclusion. The practical impact of sanctioning Taylor's specific theory here would also

hollow out the breadth of the Fourth Amendment, which applies to state actors—not just police officers. True enough, generally, the Fourth Amendment is applied to law enforcement. Ostensibly, licensed law enforcement. But government actors frequently engage in conduct that triggers Fourth Amendment protection. That they do not have a law enforcement license to do so under state law does not automatically render their conduct unconstitutional. Taking Plaintiff's theory to its logical extension, every search or seizure can only be performed by a *licensed* individual. No federal law demands that, and Plaintiff has not provided any authority for a contrary position. Thus, Plaintiff's licensure theory does not serve as a tenable basis for his § 1983 claims.

Time over, the Supreme Court and Fifth Circuit alike have held that a lawful arrest is one substantiated by probable cause, plain and simple. *See, e.g.*, *id*. at 173; *United States v. Bain*, 135 F. App'x 695, 696 (5th Cir. 2005) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Similarly, both the Supreme Court and the Fifth Circuit have "equated a lawful arrest with an arrest based on probable cause: [a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; *that intrusion being lawful*, a search incident to arrest requires no additional justification." *Moore*, 553 U.S. at 177 (internal quotations omitted); *see also United States v. Galbert*, 229 F. App'x 307, 308 (5th Cir. 2007) (citing *United States v. Hernandez*, 825 F.2d 846, 852 (5th Cir. 1987) ("It is well established that an arrest of a suspect based on probable cause is a reasonable intrusion of the Fourth Amendment and that a search incident to such an arrest is therefore valid and requires no additional justification.")).

Thus, Taylor's claims can only survive summary judgment if the search and seizure to which Deputy Williamson subjected him lacked probable cause. But as Defendants note, nowhere does Taylor contest that probable cause does not support his arrest or its attendant search (Dkt.

#64 at p. 23; *see also* Dkt. #74; Dkt. #28). In fact, it appears that Taylor never advanced such an argument in his underlying criminal proceedings. The *only* basis Taylor claims his stop, search, and arrest were unconstitutional is that Deputy Williamson's license was not active (Dkt. #74 at pp. 38–41). Because Taylor does not contend, and no facts support the notion, that Deputy Williamson lacked probable cause to search and seize him, he does not have a cognizable claim for unreasonable search or seizure or unlawful arrest.[14]

Though the notion that Defendants allowed Deputy Taylor, an unlicensed law enforcement officer, to enforce the law is deeply troubling, it is not one for which a § 1983 claim may be founded. While no Fifth Circuit analog addresses this narrow question, Courts routinely reject attempts to shoehorn what is, in truth, a state-law claim into a cause of action under § 1983. *See, e.g.*, *Jones v. Lowndes Cnty., Miss.*, 678 F.3d 344, 352 (5th Cir. 2012) (quoting *Moore v. Marketplace Rest. Inc.*, 754 F.2d 1335, 1349 (7th Cir. 1985) ("An alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution."); *United States v. Jones*, 185 F.3d 459, 462 (5th Cir. 1999) (explaining that a state law deficiency in officer's commission did not control whether a Fourth Amendment violation occurred)). So too must the Court here.

Every day, our social contract—and the laws that bind us—require submission to the badge. It would seem, then, but a modest request that a citizen be able to constitutionally expect that the badge they must submit to indicates valid licensure by each officer that wields its full might.

---

[14] In a footnote, Taylor hints at the notion that his "erratic driving alone" does not justify a warrantless arrest (Dkt. #74 at p. 41 n.182). If this terse statement were to rise to the level of a full-throated argument against the existence of probable cause, it would still fail. *See infra*, Section II.B.2. Indeed, Taylor was arrested for more than erratic driving. For example, he was arrested for resisting arrest, according to the undisputed summary judgment evidence (*See* Dkt. #56-1 at p. 5). Taylor does not dispute that there is no probable cause on that basis at all.

Defendants' arguments seem to treat issuance of the badge as perfunctory. Texas law does not; it demands more. But the Constitution does not. The Constitution sets the floor, not the ceiling. *Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 259 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). And it has nothing to say about licensure in the Fourth Amendment. That is a matter left for the states to decide. Because there is no federal constitutional right that requires that each peace officer maintain a valid, state-sanctioned law enforcement license, and because Deputy Williamson's warrantless arrest was substantiated by probable cause, Plaintiffs' claims based on the lapse of Deputy Williamson's license must be dismissed.

### 2.    Counts III & V: False Arrest & Unlawful Detention

Next, the Court turns to Taylor's claims for false arrest (Count III) and unlawful detention (Count V). Through Counts III and V, Taylor asserts that Deputy Williamson is liable for his arrest and subsequent detention because the affidavits and arresting documentation Deputy Williamson submitted to JP McCulloch were deliberately or recklessly materially misleading as to his status as a peace officer (Dkt. #74 at p. 43; Dkt. #28 at pp. 29, 33). Taylor argues that Deputy Williamson violated his Fourth Amendment rights under the Supreme Court's decision in *Franks*. That is, an individual's rights under the Fourth Amendment are violated when an officer, in support of a warrant, includes in an affidavit a "'false statement knowingly and intentionally, or with reckless disregard for the truth' and 'the allegedly false statement is necessary to the finding of probable cause.'" *Garcia v. Orta*, 47 F.4th 343, 352 (5th Cir. 2022) (quoting *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018)); *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). According to Taylor, Deputy Williamson only included one such fact in the affidavits he submitted to JP McCulloch: that he was a peace officer (Dkt. #74 at p. 43). Taylor also claims that Deputy Williamson's omission of the status of his peace officer's license gives rise to a Fourth Amendment violation (Dkt. #74 at p. 43).

Defendants, for their part, move for summary judgment on this claim because the independent intermediary doctrine applies and no facts suggest that Deputy Williamson deliberately or recklessly provided JP McCulloch with false information (Dkt. #64 at p. 27). According to Defendants, Taylor cannot carry his burden to overcome the independent intermediary doctrine because the summary judgment record shows that Deputy Williamson subjectively "believed that he was a fully licensed peace officer" when he arrested Taylor (Dkt. #64 at p. 27). Thus, he was not deliberate or reckless in presenting information to JP McCulloch, and therefore no violation occurred, so the argument goes (Dkt. #64 at p. 27).

Under the independent intermediary doctrine, "'even an officer who acted with malice . . . will not be liable if *the facts* supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's 'independent' decision 'breaks the causal chain' and insulates the initiating party.'" *Hall v. Trochessett*, 105 F.4th 335, 342 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1173 (2025) (quoting *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988) (emphasis in original)). Indeed, "'[i]t is well settled that if facts supporting an arrest are placed before an independent intermediary . . . the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party.'" *Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) (quoting *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017)). However, liability will still attach if an exception applies. Enter *Franks. Terwilliger v. Reyna*, 4 F.4th 270, 281 (5th Cir. 2021) ("Functionally, . . . *Franks* is an exception to the independent intermediary doctrine . . . .").

*Franks* and its progeny establish the exception to the independent intermediary doctrine. That is, "the initiating party may be liable for false arrest if the plaintiff shows that 'the deliberations of that intermediary were in some way *tainted* by the actions of the defendant.'" *Id.*

49

Occasionally, the Fifth Circuit calls this the "'taint exception.'" *Wilson*, 33 F.4th at 208 (quoting *McLin*, 866 F.3d at 689). To show "taint," under that exception, a plaintiff must show that the officer "deliberately or recklessly provided false, material information for use in an affidavit" in support of probable cause or made "knowing and intentional omissions that result[ed] in a warrant being issued without probable cause." *Mayfield v. Butler Snow, L.L.P.*, 75 F.4th 494, 500 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 810 (2024) (citing *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017)); *Franks*, 438 U.S. at 155–56. Further, the allegedly false statement must be "necessary to the finding of probable cause." *Garcia v. Orta*, 47 F.4th 343, 352 (5th Cir. 2022). "To determine if an allegedly false statement is 'necessary to the finding of probable cause,' the court must consider the affidavit as if those false statements were removed and consider whether the 'remaining content' would still support a probable cause finding." *Id.* (quoting *Franks*, 438 U.S. at 156).

The only defects in the affidavit, according to Taylor, are the inclusion of one falsehood and the omission of one truth, both regarding Deputy Williamson's licensure. That is, Deputy Williamson stated that he was "a peace officer under the laws of the State of Texas" and also omitted that his license was invalid (Dkt. #74 at p. 43). Plaintiff claims that there is "no dispute that these omissions and false statements were necessary for JP McCulloch to find probable cause for Plaintiffs' warrantless arrest and Taylor's blood search warrant" (Dkt. #74 at p. 43). To anchor that position, Plaintiffs cite JP McCulloch's Declaration, which stated, in relevant part, that:

> Near the end of our meeting, [JP McCulloch] told Sheriff Smith that anyone arrested by [Deputy] Williamson needed to be immediately released from the custody of Delta County Sheriff's Office. [JP McCulloch] also told him that anyone arrested or charged with a crime by [Deputy] Williamson needed to have their record wiped clean because all these people were unlawfully arrested.

(Dkt. #74 at p. 43; Dkt. #102-1 at p. 3). Plaintiffs ignore, however, that Defendants *do* dispute that the statements were necessary as a matter of law to ground the warrants in probable cause (*See* Dkt.

#64 at pp. 28–29). Plaintiffs also overstated JP McCulloch's testimony, which does not conclusively establish that Deputy Williamson's statement and omission tainted her finding of probable cause. Granted, as Plaintiffs point out, a fact issue exists as to Deputy Williamson's mental state when executing the affidavit (*Compare* Dkt. #74 at pp. 41–46, *with* Dkt. #64 at p. 64). But the existence of that fact question is not dispositive because Taylor cannot establish that Deputy Williamson's statement and omission was constitutionally necessary to a finding of probable cause. But that is the only constitutional question before the Court—whether, absent that statement and omission, the affidavit "would still support a finding of probable cause." *Garcia*, 47 F.4th at 352. It would.

Constitutionally speaking, Deputy Williamson's licensure under Texas law is not strictly necessary for probable cause to exist. *See supra* II.B.1. Once more, "[t]he Court must look to federal constitutional standards, not state code, to determine if a constitutional violation occurred." *Roan Bros. Tile Co. v. City of Garland*, No. 3:04-CV-1090-B, 2006 WL 8437017, at *12 (N.D. Tex. Jan. 12, 2006) (citing *Martinez v. City of Schenectady*, 115 F.3d 111, 116 (2d Cir. 1997) (noting that whether a warrant was issued in contravention of state law is an entirely different question than whether an officer reasonably believed it met federal constitutional standards)); *United States v. Shaw*, No. 19-CR-00157-01, 2020 WL 3816312, at *5 (W.D. La. Feb. 21, 2020), *report and recommendation adopted*, No. 19-CR-00157-01, 2020 WL 3806297 (W.D. La. July 6, 2020) (citing *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006) ("Technical violations of state law do not invalidate the warrant.")). "The Fourth Amendment commands that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *United States v. Richardson*, 943 F.2d 547, 549 n.4 (5th Cir. 1991) (quoting U.S. CONST. amend. IV). It does not add " . . . by a law enforcement officer who holds a valid peace officer's license in their jurisdiction," or anything of the sort. *See* U.S. CONST.

amend. IV. There is no dispute that Deputy Williamson's affidavit was sworn (*See* Dkt. #74; Dkt. #64; Dkt. #56-1 at p. 19). And so, the *constitutional* question is simply whether probable cause exists absent his alleged omission and falsity. *See Garcia*, 47 F.4th at 352. Probable cause, of course, "exists if the facts and circumstances known to the officer warrant *a prudent man* in believing that [an] offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959) (emphasis added). Once again, not to a "*prudent officer with a valid state-issued peace officer's license.*" *See id.*

Whether probable cause exists is a question entirely separate and apart from whether it exists to an officer validly licensed in their jurisdiction. And here, it does. Regardless of Deputy Williamson's mental state, the *facts* in the affidavit support a finding of probable cause, even without the omission of his licensure status and his statement that he was a peace officer. *See Garcia*, 47 F.4th at 352. Any complaint as to the content of the affidavit, beyond probable cause, oath, and affirmation, is a matter for Texas law—not a Federal Constitutional claim. *See* U.S. CONST. amend. IV. Taylor has, therefore, not carried his burden under *Franks* to overcome the independent intermediary doctrine. Thus, Taylor's claim for false arrest and unlawful detention, both of which are predicated upon the same theory of invalidity based on Deputy Williamson's licensure, should be dismissed as not cognizable under § 1983.

### 3.    Counts IV & X: Malicious Prosecution

Next, the Court turns to Taylor's malicious prosecution claims against Deputy Williamson (Count IV) and against the remaining Defendants (Count X). They must be dismissed. Defendants claim an entitlement to summary judgment on Counts IV and X because "'[t]here is no right to be free from malicious prosecution'" (Dkt. #64 at p. 27) (quoting *Morgan v. Chapman*, 969 F.3d 238, 246 (5th Cir. 2020)). Plaintiffs offer nothing in response. In fact, their Response does not defend those claims at all (*See generally* Dkt. #74). Those claims should be dismissed, therefore, as

abandoned. *See Arias*, 2019 WL 2770160, at *2. Holding abandonment aside, dismissal would remain the appropriate disposition of those claims because Defendants' assertion is correct. As the Fifth Circuit has stated, "there is no freestanding right under the Constitution to be free from malicious prosecution." *Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020). "[F]acts amount to malicious prosecution are properly alleged as part of an actual Fourth Amendment claim, such as unreasonable search or seizure." *Id.* District courts are right, then, to dismiss independent claims for malicious prosecution. *Id.*; *Castellano v. Fragozo*, 352 F.3d 939, 954 (5th Cir. 2003) (en banc); *Porter v. Lear*, 751 F. App'x 422, 432 (5th Cir. 2018) *Burgess v. Bassichis*, No. 418CV00681ALMCAN, 2020 WL 5267574, at *10 n.20 (E.D. Tex. Aug. 11, 2020), *report and recommendation adopted*, No. 4:18-CV-681, 2020 WL 5258316 (E.D. Tex. Sept. 3, 2020). Because "[t]here is no independent constitutional claim for malicious prosecution[]," Count IV and Count X should be dismissed. *See Arnold*, 979 F.3d at 270.

### 4.    Count IX: False Imprisonment

Count IX of Plaintiffs' Amended Complaint asserts that Plaintiffs' were falsely arrested at the unlicensed hand of Deputy Williamson in violation of the Fourteenth Amendment (Dkt. #28 at p. 42). According to Plaintiffs, because Deputy Williamson "did not possess lawful authority to act as a law enforcement officer under Texas Law[,]" after Deputy Williamson arrested Plaintiffs, he was "subjected to incarceration instituted pursuant to wrongful legal processes and materially false evidence" (Dkt. #28 at p. 43). When Sheriff Smith, Attorney Garrett, and Judge Murray "became collectively aware" that Taylor was "incarcerated despite the presence of significant exculpatory evidence[,]" they "refused to release" him (Dkt. #28 at p. 43). Hence, Taylor claims that Sheriff Smith, Delta County, Attorney Garrett, and Judge Murray violated his Fourteenth Amendment due process rights (Dkt. #28 at p. 43).

Defendants move for summary judgment on this Count, arguing that "Taylor's arrest was conducted in the presence and with the full participation of a peace officer who was inarguably licensed by [the] TCOLE" who saw Taylor commit several criminal offenses (Dkt. #62 at pp. 31–32). Therefore, there is no violation, Defendants submit.

Taylor responds that "the existence of other officers at the scene does not diminish the fact that the main arresting and charging officer, [Deputy] Williamson, had no authority to conduct the warrantless arrest or charge Plaintiffs with any offense" (Dkt. #74 at p. 54). In support, Taylor notes that JP McCulloch's Declaration suggests that Deputy Williamson's "lack of lawful authority to conduct the warrantless arrests was substantial exculpatory evidence that warranted the immediate release of Plaintiff from their imprisonment and their records wiped clean" (Dkt. #74 at p. 54). Taylor submits that the question of whether that evidence was exculpatory is one for a jury to decide (Dkt. #74 at p. 54). Having ventilated the arguments for and against summary judgment on this claim, the Court returns to the applicable law in which Taylor seeks to root Count IX.

In *Soto v. Ortiz*, the Fifth Circuit considered whether erroneous detention could give rise to a § 1983 claim under the Fourteenth Amendment. *Soto v. Ortiz*, 526 F. App'x 370, 374 (5th Cir. 2013). In line with Supreme Court precedent, the Court answered, "sometimes," depending on the scienter of the officers alleged to have been responsible for the erroneous detention. *See id.* at 374–75. In articulating that standard, the Fifth Circuit recalled *Baker v. McCollan*, where the Supreme Court held that a plaintiff's wrongful detention "pursuant to a facially valid warrant did not amount to a deprivation of his constitutional rights for purposes of his § 1983 claim." *Id.* at 374 (citing 443 U.S. 137, 143–44 (1979)). As the Fifth Circuit put it, "central to [*Baker*'s] holding was that the Fourteenth Amendment does not protect against all deprivations of liberty but only against

54

deprivations of liberty 'without due process of law.'" *Id.* (quoting *Baker*, 443 U.S. at 145). At the same time, however, "the [Supreme] Court cautioned that a wrongful detention pursuant to a valid warrant in the face of repeated protestations of innocence over a duration of time could amount to a violation of due process." *Id.* (citing *Baker*, 443 U.S. at 374). In that vein, the Supreme Court has held that "'the Due Process Clause is simply not implicated by a *negligent* act of an official causing united injury to life, liberty, or property.'" *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 328 (1986)). So too has the Fifth Circuit. *See Harris v. Payne*, 254 F. App'x 410, 419–20 (5th Cir. 2007) (citing *Sanchez v. Swyden*, 139 F.3d 464, 465 (5th Cir. 1998); *Simmons v. McElveen*, 846 F.2d 337, 338–39 (5th Cir. 1988)).

When officers are more than merely negligent, however, courts have reached the opposite result. Indeed, in *Sanders v. English*, the Fifth Circuit held that a violation occurs, and an officer does not enjoy qualified immunity therefrom, where the officer "'knowingly and willfully ignored substantial exculpatory evidence.'" *Id.* (quoting 950 F.2d 1152, 1162 (5th Cir. 1992)). A failure to investigate, however, may remain negligent, rather than a knowing and willful violation. *Id.* (citing *Sanders*, 950 F.2d at 1159–60). These examples in mind, "allegations that an officer had exculpatory information in his possession but did not take the affirmative step of reviewing it are not sufficient to state a due process claim." *Id.* at 420 (citing *Sanchez*, 139 F.3d at 469). To have a cognizable claim, "[i]nstead, as in *Sanders*, the plaintiff must demonstrate that the officer knew or should have known that the plaintiff was wrongly detained." *Id.*

Here, unlike in *Sanders*, however, the exculpatory evidence Taylor claims should have been turned over to him does nothing to demonstrate his innocence. *See Sanders*, 950 F.2d at 1162. And this case is nothing like *Soto*, where the defendant was detained erroneously, or any other in which

substantial, factual exculpatory evidence was withheld. *See Soto*, 526 F. App'x at 374–75 (collecting cases). Instead, this claim is merely a repackaging of Taylor's argument that his entire prosecution should be upended due to Deputy Williamson's expired peace officer's license. That state law defect does not defeat the fact that Taylor's arrest was grounded in probable cause. Thus, Count IX should also be dismissed.

### 5.    Count VI: Excessive Force

Next the Court turns to Taylor's claim for excessive force under the Fourth Amendment as articulated in Count VI (Dkt. #28 at p. 35). The Fourth Amendment protects against the excessive use of force. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006); *Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021). "To prevail on an excessive-force claim, the plaintiff must show: (1) an injury, (2) that resulted directly from the officer's use of force, and (3) that the force used was 'objectively unreasonable.'" *Aguirre*, 995 F.3d at 406 (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)); *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). "The Second and third elements collapse into a single objective reasonableness inquiry, guided by the following *Graham* factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively unreasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

56

*Id.* at 397. On the whole, whether the use of force is reasonable is a totality of the circumstances inquiry. *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

a.    *Injury*

Beginning with the first element, Deputy Williamson does not dispute that Taylor was injured (*See* Dkt. #64). "'Although a showing of 'significant injury' is no longer required in the context of an excessive force claim, [the Fifth Circuit] do[es] require a plaintiff asserting an excessive force claim to have suffered at least some form of injury.'" *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 2001)) (some internal quotation marks omitted). "The injury must be more than *de minimis* and must be evaluated in the context in which the force was deployed." *Id.* (cleaned up). Though "certain injuries are so slight that they will never satisfy the injury element, *see, e.g.*, *Glenn*, 242 F.3d at 314 (holding that 'handcuffing too tightly, without more, does not amount to excessive force'), psychological injuries may sustain a Fourth Amendment claim." *Flores*, 381 F.3d at 397–98 (citing *Dunn v. Denk*, 79 F.3d 401, 402 (5th Cir. 1996) (en banc)). "In the case of psychological injury," however, "'[o]nly substantial'" ones may constitute an "injury" for purposes of an excessive force claim. *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 300 F. Supp. 3d 857, 891 (N.D. Tex. 2018) (quoting *Carter v. Diamond URS Huntsville, LLC*, No. Civ. A. H-14-2776, 2016 WL 8711499, at *5 (S.D. Tex. Sept. 30, 2016)).

Taylor's Declaration alleges that Deputy Williamson "roughly grabbed [him] by the arm to turn [him] around" (Dkt. #74-1 at p. 63). He claims that Deputy Williamson continued to "forcefully push[] [Taylor's] arm up behind [his] back and pushed [his] face first against [Deputy Williamson's] vehicle" (Dkt. #74-1 at p. 63). While trying to place handcuffs on Taylor, Deputy Williamson continued to "painfully force one arm up against [Taylor's] back" and "twist[] [his]

arms," which caused Taylor pain (Dkt. #74-1 at p. 64). Taylor avers that, suddenly, Deputy Williamson "slammed [Taylor] face-first on the ground causing [Taylor's] head to strike the ground," knocking him unconscious (Dkt. #74-1 at p. 64). Deputy Williamson continued to keep Taylor pinned to the ground after placing Taylor in a "chokehold" (Dkt. #74-1 at p. 64). Taylor also claims that Deputy Williamson "squeez[ed] the inside of [his] legs and thighs causing [him] great pain" (Dkt. #74-1 at p. 64). These alleged injuries surpass the type of "incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest." *See Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). As the Fifth Circuit has held, "injuries such as abrasions, head injuries, and contusions are significant enough to satisfy the injury element of an excessive force claim." *Matthews v. Harris Cnty.*, No. CV H-18-0014, 2019 WL 2764448, at *5 (S.D. Tex. July 2, 2019) (citing *Anderson v. McCaleb*, 480 F. App'x 768, 772 (5th Cir. 2012)); *Hay v. Irving*, 893 F.2d 796, 798 (5th Cir. 1990). Because Deputy Williamson does not dispute that Taylor was injured, the Court proceeds to analyze the objective reasonableness of the force applied, assuming Taylor was in fact injured.[15] Accordingly, the Court proceeds to assess the objective reasonable of the force deployed against Taylor. Because the summary judgment record shows that the force is objectively reasonable, Taylor's excessive force claim should be dismissed.

        *b.*    Graham *Factors*

      In assessing the reasonableness of the force applied against Taylor, the Court performs the requisite analysis under *Graham* to determine whether the force Deputy Williamson applied was objectively unreasonable. That determination "requires careful attention to the facts and

---

[15] Deputy Williamson also does not dispute the causation element of Taylor's excessive use of force claim (*See* Dkt. #64). *See also Aguirre*, 995 F.3d at 406 (stating that the second element of an excessive use of force claim is that the injury a plaintiff suffered "resulted directly from the officer's use of force").

circumstances of each particular case . . . ." *Graham*, 490 U.S. at 396. Again, the Court must consider "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Peña*, 879 F.3d at 619 (quoting *Graham*, 490 U.S. at 396). Applying these factors, the Court determines that genuine issues of material fact preclude granting Deputy Williamson's Motion for Summary Judgment.

Analyzing the objective reasonableness of force applied requires the Court to "slosh its way through a fact bound morass." *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)) (internal quotations omitted) (cleaned up). And so, the Court begins with the facts before it. The Parties dispute much of what occurred, but the video evidence does much to put Taylor's account of the facts to rest.

The only evidence that Taylor submits in support of his use of force claim is his Declaration (Dkt. #74-1 at pp. 63–65). He claims that, on the night in question, he was neither speeding nor driving erratically and "did not notice . . . a law enforcement vehicle with its lights on anywhere near [his] general vicinity" (Dkt. #74-1 at p. 63). He states that, after he parked his vehicle in his driveway, Deputy Williamson "appeared out of nowhere" (Dkt. #74-1 at p. 63). When Deputy Williamson asked Taylor why he "ran from him," Taylor claims to have responded that he did not see Deputy Williamson (Dkt. 74-1 at p. 63). Taylor claims that Deputy Williamson "aggressively interrogate[d]" him and then, in a manner seemingly unprovoked to Taylor, "roughly grabbed [him] by the arm to turn [him] around" (Dkt. #74-1 at p. 63). According to Taylor, Deputy Williamson "then forcefully pushed [his] arm up behind [his] back and pushes [him] face first against his vehicle" (Dkt. #74-1 at p. 63). Deputy Williamson then "took out his . . . handcuffs and

ordered [Taylor] to provide [his] other hand" (Dkt. #74-1 at p. 63). Per Taylor's account, "before [he] could even respond," Deputy Williamson said, "want to make this painful?" (Dkt. #74-1 at p. 64). After twisting his arms and "without justification," Taylor claims that Deputy Williamson "slammed [him] face-first on the ground" (Dkt. #74-1 at p. 64). Taylor claims this knocked him unconscious and that Deputy Williamson placed Taylor in a "chokehold" (Dkt. #74-1 at p. 64). Taylor claims that Deputy Williamson continued to restrain Taylor by placing his knee on his back while he waited for another officer to arrive to "aid [Deputy] Williamson in pinning [him] to the ground" (Dkt. #74-1 at p. 64). After finally placing him in handcuffs, Taylor claims that Deputy Williamson "began aggressively squeezing the inside of [his] legs and thighs" (Dkt. #74-1 at p. 64). When Taylor asked him to stop, Taylor claims that Deputy Williamson responded, "if you do what I tell you to do, then it won't happen" (Dkt. #74-1 at p. 64).

Taylor's version of events is refuted by video footage from Deputy Williamson and Deputy Robinson's body-worn cameras. The Court accepts that footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The body-worn camera of Deputy Williamson clearly depicts that Taylor refused to be complaint with Deputy Williamson's attempts to place him in handcuffs. It also captures Taylor's use of hostile language and active resistance toward Deputy Williamson's attempt to control him. Flatly, he would not give Deputy Williamson one of his hands to be placed in handcuffs, and he would not submit to Deputy Williamson's show of authority. It does not show, however, the moment that resulted in Taylor and Deputy Williamson going to the ground in any sort of altercation. That point of the video footage is blacked out, ostensibly because Deputy Williamson's chest-worn camera was in close contact with Taylor such that the camera's lens was obstructed. Deputy Williamson's supervisor, Sergeant Robinson, arrived on the scene with a body-worn

camera, too. While the lead-up to the arrival is not depicted in full, his body-worn camera does show that Deputy Williamson and Taylor went to the ground while Deputy Williamson attempted to put Taylor into handcuffs. Deputy Williamson's video footage, like that of Sergeant Robinson, shows that, after going to the ground, he laid there for some period of time. Once Taylor began to respond to the officers again, he remained uncompliant. Finally, the video appears to indicate that the "squeezing" of Taylor's legs was nothing more than a frisk for weapons. Next, the Court recounts the relevant police reports.

Taylor's arrest report authored by Deputy Williamson notes that Deputy Williamson reflects his account of the events as follows:

> Deputy Williamson observed a vehicle traveling above the posted speed limit on Dallas St. Williamson attempted to stop the vehicle at the offense location. The vehicle drove several blocks, attempting to lose Deputy Williamson. The vehicle stopped at a residence on E McKinney St. the Drier of the vehicle refused to follow instructions that were given by Williamson. Williamson attempted to place the driver into handcuffs and the driver resisted. Sgt. Robinson arrived on scene and assisted Williamson in securing the driver and effecting the arrest. The driver, later found to be Taylor, Patrick, BM, was arrested for DWI2nd, DWLI w/previous conv., and resisting arrest. See offense report for fur[th]er details.

(Dkt. #56-1 at p. 8).

In relevant part, the narrative report that Deputy Williamson submitted adds that Taylor's vehicle was speeding ten miles over the posted speed limit, had a defective tag light, and was the same as Deputy Williamson had seen speeding previously that evening but was unable to pursue because he was dispatched elsewhere (Dkt. #56-1 at p. 15). The report notes that, after Deputy Williamson had stopped Taylor, Taylor exited his vehicle and began to walk toward Deputy Williamson (Dkt. #56-1 at p. 15). According to Deputy Williamson, Taylor refused to stop when instructed to do so and would not get back into his vehicle, stating "I'm not afraid of you guys" (Dkt. #56-1 at p. 15). The report notes symptoms of intoxication (Dkt. #56-1 at p. 15). Deputy

Williamson adds that Taylor was resisting and turned toward Deputy Williamson, prompting him to "apply more pressure to the arm lock" and to "force[] him to lean against the trunk of his car" (Dkt. #56-1 at p. 15). As Taylor continued to struggle against Deputy Williamson, more soft hand control tactics were used (Dkt. #56-1 at p. 15). Then:

> Taylor attempted to force his arm straight. [Deputy Williamson] used a combined wrist and shoulder lock to gain control of Taylor and force him to lie on the trunk of the vehicle, face down. [Deputy Williamson] planned to hold him in that position until Sgt. Robinson could arrive and assist [Deputy Williamson] in placing Taylor into handcuffs. Taylor began to curse and fight against the lock. [Deputy Williamson] allowed the pressure to release on [Taylor's] shoulder to avoid injury, and Taylor pushed against the vehicle, causing him to slide to the left, and get free of the trunk. As he cleared the vehicle, [Deputy Williamson] used the shoulder lock to assist Taylor to the ground, which caused him to land on his back. [Deputy Williamson] did not see or hear Sgt. Robinson so [he] applied a Lateral Neck Restraint . . . until [he] realized that Robinson was there . . . .

(Dkt. #56-1 at p. 15). Deputy Williamson's report goes on to recall the details of taking Taylor into custody and how Taylor resisted throughout. Sergeant Robinson's report converges with Deputy Williamson's account (*Compare* Dkt. #56-1 at pp. 15–16, *with* Dkt. #56-1 at p. 18).

These dense facts in mind, taking the facts in the light most favorable to Taylor (as the Court must at this stage), and given the totality of the circumstances, Taylor cannot show any violation of his Fourth Amendment right against excessive use of force. The undisputed evidence shows that Deputy Williamson's application of force, along with Sergeant Robinson, was reasonable under the circumstances. The first *Graham* factor weighs against Taylor heavily. He was arrested for resisting arrest and, as the uncontroverted summary judgment evidence shows, driving while intoxicated. There is no question that Taylor's repeated resistance toward Deputy Williamson's attempt to take him into custody prompted the application of force. *See Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013). In the Court's view, that is objectively reasonable.

The second factor—whether a reasonable officer could have concluded that Taylor was an immediate threat—also weighs against Taylor. While Taylor's Declaration seems to suggest that Deputy Williamson acted aggressively toward Taylor, that could not be further from what the video shows. The video footage shows that Taylor repeatedly attempted to turn Deputy Williamson while Deputy Williamson instructed Taylor to give him his hands and turn around. It shows that Taylor repeatedly pulled away from Deputy Williamson. It also shows that Taylor was cursing and using hostile language toward Deputy Williamson, and that Taylor would not submit to Deputy Williamson's show of authority, despite repeated, polite attempts. Given this, a reasonable law enforcement officer would have concluded that Taylor constituted an immediate threat. Indeed, "the Fifth Circuit holds that a suspect who refuses to turn around and be handcuffed poses an immediate threat to officers." *Walker v. City of Houston*, No. 4:19-CV-04454, 2022 WL 4227259, at *6 (S.D. Tex. Sept. 13, 2022), *aff'd*, No. 22-20537, 2023 WL 6457926 (5th Cir. Oct. 4, 2023) (citing *Cadena v. Ray*, 728 F. App'x 293, 296 (5th Cir. 2018); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)).

Finally, the third factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—also weighs against Taylor. He was actively resisting arrest. *See Poole*, 691 F.3d at 629, 631. Further, As was the case in *Poole* and *Cadena*, where the Fifth Circuit held there was no Fourth Amendment violation when officers used at least as much force to subdue similarly situated suspects, here, Deputy Williamson, at most, used the type of "'measured and ascending actions that correspond[ed] to an arrestee's escalating verbal and physical resistance.'" *See Cadena*, 728 F. App'x at 296 (quoting *Poole*, 691 F.3d at 629). Further, as was the case in *Cadena*, Deputy Williamson spoke calmly to Taylor in an effort to detain him before escalating. *See id*. Assuming at

this stage that Deputy Williamson took Taylor down, as opposed to falling while Taylor actively resisted and attempting to break his fall, that still would not be unreasonable under the circumstances. *See Cadena*, 728 F. App'x at 296–97 (considering bringing an arrestee to the ground a reasonable escalation in an arrest attempt under like circumstances); *see also Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (holding that a "controlled takedown" was not excessive use of force when suspect evaded arrest). Finally, Taylor's allegation that Deputy Williamson was "squeezing" his legs was not an unreasonable use of force, if it was force at all. The videos show that Deputy Williamson was simply patting Taylor down. None of this will do. Thus, Taylor cannot make out a violation of his Fourth Amendment right to be free from excessive use of force. His use of force claim, therefore, should be dismissed.

### 6.    Count VII: Denial of Basic Human Needs

Lastly, the Court returns to Wiley's only remaining claim under the Eighth Amendment for denial of basic human needs against Sheriff Smith and Delta County (Count VII). According to Wiley, Sherrif Smith was Delta County's final policymaker for all jail policies (Dkt. #28 at p. 37) (citing TEX. LOC. GOV. CODE ANN. §§ 351.041–.042). Because one "single unconstitutional action by a final policymaker establishes municipal liability as the single action represents official policy for a municipality" and because Sheriff Smith "deliberately denied Wiley his mental health medication" for schizophrenia, the County and Sheriff Smith are liable for violation Wiley's Eighth Amendment rights, so the argument goes (Dkt. #28 at p. 37) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)). Thus, Wiley asserts an individual claim against Sheriff Wiley under § 1983 and a claim against the county. Because Wiley's *Monell* theory is derivative of the claim against Sheriff Smith, the Court begins by assessing whether Taylor's claim against Sheriff Smith should survive summary judgment. It should not.

Sheriff Smith moved for summary judgment on this Count, arguing that the summary judgment record "shows that [he] was not aware of facts from which he could have inferred an excessive risk to Wiley's mental or physical health, and he certainly never subjectively inferred that a potential for harm existed" (Dkt. #62 at p. 26). According to Sheriff Smith, the record shows that Wiley "underwent a mental and physical healthcare screening when he was booked into jail" (Dkt. #62 at p. 26). Sheriff Smith argues that Wiley "denied taking any medications" and "receiving mental healthcare" during the booking process (Dkt. #62 at p. 26). It was only after Wiley started manifesting signs of mental health crisis that Delta County jailers began investigating and "attempted to obtain information from his previous mental healthcare providers" (Dkt. #62 at p. 26). That occurred within the first forty-eight hours of Wiley's incarceration, during which Delta County officials also had Wiley evaluated by a "mental health professional who interviewed" Wiley and recommended that he be placed in an inpatient mental health facility (Dkt. #62 at p. 26). Sheriff Smith claims to never have visited Wiley's cell to assess his need for medication, nor did he forbid jailers from giving Wiley medication (Dkt. #62 at p. 26). According to Sheriff Smith, the record shows that Delta County jail officials confirmed that Wiley had been prescribed antipsychotic medication and began giving him medication on October 12, 2019 (Dkt. #62 at p. 26). They continued to do so until he was transferred to Kerrville State Hospital (Dkt. #62 at p. 26). Based on these facts, Sheriff Smith claims that the record does not establish any dispute as to whether he acted toward Wiley with deliberate indifference (Dkt. #62 at p. 26).

Wiley counters, arguing that a genuine issue of material fact underlies Sheriff's Smith's mental state. According to Wiley, he "submitted documentation that the mental health professional" that performed the psychological interview on Wiley while in Delta County custody

"personally informed" Sheriff Smith of Wiley's medical condition (Dkt. #74 at p. 50). Wiley also claims to have indicated that Sheriff Smith was actually aware that Delta County jail officials were not giving Wiley the medication he needed (Dkt. #74 at p. 51).

Wiley relies on the Eighth Amendment's bar against cruel and unusual punishment clause to anchor his deliberate indifference claim. That is proper given that he served his sentence after pleading guilty (Dkt. #28 at p. 11; Dkt. #66-1 at pp. 125, 178). *See Baughman v. Hickman*, 935 F.3d 302, 306 (5th Cir. 2019) (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) ("The Eighth Amendment ensures the safety of convicted prisoners while due process under the Fourteenth Amendment protects pretrial detainees.")). "To establish a constitutional violation under the Eighth Amendment's deliberate indifference standard, a plaintiff must show that the jail officials acted with deliberate indifference such as to cause the 'unnecessary and wanton infliction of pain.'" *Wigenton v. Dixon*, No. 3:14-CV-1313-N-BN, 2017 WL 3701161, at *4 (N.D. Tex. July 26, 2017), *report and recommendation adopted*, No. 3:14-CV-1313-N, 2017 WL 3700905 (N.D. Tex. Aug. 25, 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

"Finding a violation of the Eighth Amendment's prohibition against cruel and unusual punishment also requires a twofold analysis." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). First, the plaintiff "must prove objective exposure to a substantial risk of serious harm." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1995); *Lawson v. Dallas Cnty.*, 286 F.3d 257 (5th Cir. 2002)). Second, the plaintiff must prove "that prison officials acted or failed to act with deliberate indifference to that risk." *Id.* Applied to the context of medical needs, "[a] prison official violates the Eighth Amendment's prohibition on cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an

66

'unnecessary and wanton infliction of pain.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "The mere delay of medical care can also constitute an Eighth Amendment violation but only 'if there has been deliberate indifference that results in substantial harm.'" *Id.* (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

"The 'deliberate indifference' standard requires 'a showing that the official was subjectively aware of the risk of serious harm to the inmate.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 829 (1994)). "'Deliberate indifference is an extremely high standard to meet.'" *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)). "'A prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Easter*, 467 F.3d at 463 (quoting *Farmer*, 511 U.S. at 829); *see also Arenas*, 922 F.3d at 621 (quoting *Gobert*, 463 F.3d at 346) ("A prison official displays deliberate indifference only if he (1) 'knows that inmates face a substantial risk of serious bodily harm' and (2) 'disregards that risk by failing to take reasonable measures to abate it.'"). "Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, 'nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.'" *Arenas*, 922 F.3d at 620 (quoting *Gobert*, 463 F.3d at 346). "Rather, an inmate 'must show that the officials refused to treat him, ignores his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (quoting *Domino*, 239 F.3d at 756). "However, a

prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Easter*, 467 F.3d at 463 (citing *Farmer*, 511 U.S. at 829).

These principles in mind, the Court pivots to the factual inquiry that lays ahead. Sheriff Smith does not contest in any way, shape, or form, that Wiley has established the objective prong of the inquiry (*See* Dkt. #62). Instead, his argument in favor of summary judgment turns exclusively on the subjective prong. That is, he argues that the summary judgment record cannot establish a question as to whether he acted with deliberate indifference (*See* Dkt. #62 at pp. 26–27). Thus, the only question the Court must answer is whether a genuine issue of material fact precludes summary judgment on Wiley's Eighth Amendment claim because Sheriff Smith may have acted with deliberate indifference. The answer to that question is no. Summary judgment is appropriate on Wiley's Eighth Amendment claim because he has not carried his burden to show a genuine issue of material fact underlying the alleged violation.

Through his Declaration, Wiley claims that he told Delta County Jail officials that he suffered from schizoaffective disorder. Indeed, his Declaration states that, "[d]uring the booking process, [he] informed the detention officers that [he] suffered from a mental health disability, schizoaffective disorder" (Dkt. #74-1 at p. 46). He also claims to have "told the detention officers that [he] needed to take [his] medication, olanzapine, every day to manage [his] mental health disability" (Dkt. #74-1 at p. 46). Wiley submits that he did not receive his medication (Dkt. #74-1 at p. 46). After appearing before JP McCulloch, Wiley was taken back to the jail, where he still had not been given his medication, then for a period of two days (Dkt. #74-1 at p. 46). His Declaration also notes that, when interviewed in Delta County Jail, he "struggled with [his] mental health and had difficulties interacting and speaking with" the mental health interviewer (Dkt. #74-1 at p. 46).

Assuming all of this is true, none of it establishes Sheriff Smith's involvement whatsoever. Though Wiley's Response claims otherwise, that is simply not the reality. Wiley's Response claims that he "submitted competent evidence indicating a genuine issue of material fact about [Sheriff] Smith's knowledge of . . . Wiley's medical condition; his deteriorating mental state; and the denial of [his] medication" (Dkt. #74 at p. 50). None of it moves the needle toward a reasonable question as to Sheriff Smith's involvement, let alone a conclusion that he was deliberately indifferent. Wiley's Response also claims, citing nothing, that he submitted "documentation that the mental health professional" who examined him while in custody "personally informed [Deputy] Smith of . . . Wiley's medical condition and his need for [medication] when she visited the Delta County Jail" (Dkt. #74 at p. 50). Wiley also claims, once more citing nothing, to have shown that Deputy Smith was "aware that his officers were failing to provide" Wiley his prescription (Dkt. #74 at p. 50). Having hunted through the summary judgment record, the Court sees no evidence that would amount to a reasonable dispute that a genuine issue of material fact underlies Sheriff Smith's knowledge. Though one relevant document (*see* Dkt. #74-1 at p. 58) bears Sheriff Smith's name, nothing suggests that he was personally involved in denying Wiley medication or that he was aware of it. For that reason, Wiley has not carried his burden to show a genuine issue of material fact on his Eighth Amendment claim. The evidence does not even begin to chip away at the "extremely high" bar that the deliberate indifference standard sets. *See Arenas* 922 F.3d at 620 (5th Cir. 2019).

As a final note regarding this claim, the Court turns briefly to Plaintiffs' Eighth Amendment theory of *Monell* liability against Delta County (Dkt. #28 at pp. 28–39). Because Plaintiffs have not carried their burden to show a genuine issue of material fact underlying his Eighth Amendment

claim, Plaintiffs' theory of municipal liability that rests upon that alleged violation must fail as a matter of law. *See Landry*, 852 F. App'x at 127.

### 7.    Count VIII: Unlawful Official Hiring Policies (VIII)

Having disposed of each of Plaintiffs' claims that alleged an independent violation of a constitutional right, the Court turns to the derivative claims, beginning with unlawful hiring policies (Count VIII). Through Count VIII, Plaintiffs again assert that, because under Texas law Sheriff Smith is Delta County's final policymaker regarding law enforcement hiring, and because Sheriff Smith made an "unlawful hiring decision[]" in hiring Deputy Williamson, Delta County should be held liable for the harm Plaintiff claims ensured (Dkt. #28 at pp. 39–41). Plaintiffs claim that Deputy Smith's "single unconstitutional decision to hire and employ [Deputy] Williamson . . . was the moving force behind" the alleged violations of Plaintiff's Fourth Amendment rights "to be free from malicious prosecution, unreasonable search and seizure, unlawful arrest, unlawful detention, and excessive force" (Dkt. #41 at p. 28). At bottom, this is a *Monell* claim that seeks to hold Delta County liable for Deputy Williamson's alleged violations of the Fourth Amendment.

Delta County moved for summary judgment on this claim. The predominant argument in support of its Motion is its position that that no evidence suggests that Sheriff Smith was deliberately indifferent to any known or obvious consequences of hiring Deputy Williamson (*See* Dkt. #66 at pp. 31–34). Delta County also disputes that any policy, custom, or practice of deliberate indifference in hiring exists (Dkt. #66 at p. 34).

"To prove that a municipal hiring or training policy violated his rights under § 1983, a plaintiff must show: '(1) the training or hiring procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and (3) the inadequate hiring or training policy directly caused the plaintiff's

injury.'" *Langiano v. City of Fort Worth, Tex.*, No. 4:21-CV-00808-O, 2022 WL 6813630, at *6 (N.D. Tex. Sept. 10, 2022), *aff'd*, 131 F.4th 285 (5th Cir. 2025) (quoting *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992) (footnote omitted)). Such a claim must be grounded in an underlying constitutional injury. *Winder v. Gallardo*, 118 F.4th 638, 647 (5th Cir. 2024), *cert. denied*, No. 24-975, 2025 WL 1727396 (U.S. June 23, 2025) (quoting *Landry v. Laborde-Lahoz*, 852 F. App'x 123, 127 (5th Cir. 2021) ("It is well established that there must be an underlying constitutional violation for there to be a claim under *Monell*.").

A municipality may be held liable for hiring unqualified officers if the plaintiff can prove "'deliberate indifference' to the 'known or obvious consequences' of such" a decision. *Gomez v. Galman*, 18 F.4th 769, 778 (5th Cir. 2021) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). As already stated, a plaintiff will not satisfy the deliberate indifference standard if he is only able to show "simple or even heightened negligence." *Gros v. City of Grand Prairie*, 209 F.3d 431, 433 (5th Cir. 2000) (internal quotations omitted). Instead, "'deliberate indifference' exists where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights." *Id.* (citing *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998), *cert. granted*, 525 U.S. 1098, *and cert. dismissed*, 526 U.S. 1083 (1999)). Thus, "plaintiffs cannot succeed in defeating summary judgment merely because there was a probability that a poorly-screened officer would violate their protected rights; instead, they must show that the hired officer was highly likely to inflict the particular type of injury suffered by them." *Id.* (citing *Brown*, 520 U.S. at 412). Indeed, "'predicting the consequence of a single hiring decision, even based on an inadequate assessment of a record, is far more difficult than predicting what might flow

from the failure to train a single law enforcement officer as to a specific skill necessary to discharge his duties.'" *Rivera v. Bonner*, 952 F.3d 560, 565 (5th Cir. 2017) (quoting *Brown*, 520 U.S. at 410). Therefore, a plaintiff asserting an unlawful hiring claim must show that there was a "strong connection between the background of the particular applicant and the specific violation alleged." *Gros*, 209 F.3d at 433 (citing *Brown*, 520 U.S. at 412). Plaintiffs cannot meet that burden here.

Plaintiffs suggest that Sheriff Smith—the conceded policymaker for Delta County Sheriff's Department's hiring decisions—exercised deliberate indifference toward Deputy Williamson's alleged failure to maintain his state-law peace officer's license active and Deputy Williamson's "history of unconstitutional conduct" (Dkt. #28 at p. 55). Because any deficiency in Deputy Williamson's licensure is not a matter of the Federal Constitution's Fourth Amendment, *see supra* II.B.1, it follows that his licensure cannot form a basis for this *Monell* claim. *See Winder*, 118 F.4th at 647. And having determined that Plaintiffs' claims for "malicious prosecution, unreasonable search and seizure, unlawful arrest, unlawful detention, and excessive force" should be dismissed *supra*, Plaintiff's *Monell* claim, which is predicated exclusively upon alleged Fourth Amendment injuries, must fail, too.

But even assuming *arguendo* that Plaintiffs' alleged excessive force claim—a matter wholly separate from Deputy Williamson's licensure—should survive summary judgment (though it does not), Plaintiffs' pendent *Monell* claim should still be dismissed. That is because Plaintiffs cannot show a genuine issue of material fact as to deliberate indifference. Assuming the existence of an injury, and given that the parties appear to agree that Sheriff Smith is the policymaker, the Court turns to the remaining elements under *Monell*: (1) whether a policy existed; (2) whether Sheriff Smith acted with deliberate indifference; and (3) causation. *See Brown*, 219 F.3d at 457.

Certainly, Sheriff Smith's decision to hire Deputy Williamson may constitute a policy for purposes of *Monell*. Delta County does not appear to dispute that (*See generally* Dkt. #66). Rightly so, because "'a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 406).

Plaintiffs' theory falls apart at the second element. As Delta County correctly notes, the Fifth Circuit has held that "failing to respond to a history of 'bad or unwise acts' that 'demonstrate lack of judgment, crudity, and, perhaps illegalities' is not enough for deliberate indifference" (Dkt. #66 at p. 31) (quoting *Livezey v. The City of Malakoff*, 657 F. App'x 274, 278 (5th Cir. 2016) (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). Though Plaintiffs' First Amended Complaint appears to base this *Monell* claim, at least as derivative of Taylor's excessive force claim, on Deputy Williamson's history of deploying force, their Response does not point to any case in which hiring an officer alleged to have used force previously *per se* gives rise to deliberate indifference (*See* Dkt. #74). Delta County, however, argues that the summary judgment record does not present any genuine issue of material fact as to Sheriff Smith's knowledge of Deputy Williamson's "history of unconstitutional conduct" (Dkt. #66 at p. 33).

Seemingly, Plaintiffs' only argument against that position would derive from Plaintiffs' First Amended Complaint, where they note that Deputy Williamson was sued for using lethal force in 2018 and his dangerous use of a patrol rifle in 2013 (*See* Dkt. #28 at pp. 6–7). But those two instances would not be enough to establish deliberate indifference here. First, as to the prior shooting, Deputy Williamson was cleared of any wrongdoing, according to the uncontroverted summary judgment record (*See* Dkt. #56-1 at p. 66). Second, as to both the shooting and his use of

a patrol rifle, neither scenario, even assuming Deputy Williamson's conduct was declared wrongful, indicates a "strong connection" to the soft hand control techniques used to arrest Taylor here. *See Brown*, 520 U.S. at 412 ("[A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.") (emphasis in original); *Arevalo v. City of Farmers Branch, Tex.*, No. 3:16-CV-1540-D, 2018 WL 1784508, at *9 (N.D. Tex. Apr. 13, 2018); *Sindelir v. Vernon*, No. 3:22-CV-1567-D, 2023 WL 2064726, at *5 (N.D. Tex. Feb. 16, 2023). Accordingly, Plaintiffs' *Monell* claim predicated upon Deputy Williamson's use of force should be dismissed.

### 8.    Count XI: Civil Conspiracy

Finally, the Court addresses Taylor's claim for civil conspiracy (Count VI). "For a conspiracy claim under § 1983, a plaintiff must prove: "(1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Armstrong v. Ashley*, 60 F.4th 262, 280 (5th Cir. 2023) (citing *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990)). Because Plaintiffs have not raised a fact issue such that any cognizable deprivation of civil rights remains, the Court must dismiss Plaintiffs' civil conspiracy claim in full. *See Aiken v. Rimkus Consulting Group Inc.*, 333 F. App'x 806, 812 (5th Cir. 2009) ("[A] civil conspiracy claim cannot stand alone but must be based on an underlying tort.").

## III.    Immunities

For the avoidance of doubt, though no fact issues exist as to Plaintiffs alleged violations of their constitutional rights, the Court proceeds briefly to analyze the claims of immunity that Defendants raise. Rest assured, even if any violations had occurred, immunities bar their continued

pursuit any further. Defendants raise four different types of immunities, which they seek to invoke in defense of various claims. Specifically, Defendants claim that the following immunities apply:

1.  Judge Murray claims that he is judicially immune from all of Plaintiffs' claims.
2.  Attorney Garrett claims that prosecutorial immunity shields him from all of Plaintiffs' claims.
3.  Sheriff Singleton, Sheriff Smith, Deputy Williamson, Judge Murray, and Attorney Garrett claim that they are entitled to qualified immunity against all of Plaintiffs' claims.

The Court addresses each in turn. But before doing so, the Court notes that Defendants also claim that official immunity bars Plaintiffs' state law claims (Dkt. #56 at p. 40; Dkt. #58 at p. 39; Dkt. #60 at p. 32; Dkt. #62 at p. 39; Dkt. #64 at p. 38). Because the Court has already dismissed those claims as abandoned, the Court need not assess official immunity's applicability here.

### A.    Judicial Immunity

The Court begins with judicial immunity as applied to Judge Murray. According to Defendants, "the only actions Judge Murray took with respect to . . . Taylor's charges were in his judicial capacity and related to a prosecution—a normal judicial function of a Delta County Judge" (Dkt. #56 at p. 32). Accordingly, Defendant argues that judicial immunity applies. Plaintiffs disagree, arguing that administrative decisions are excluded from immunity and that Judge Murray acted in an administrative capacity with respect to Taylor's claims (Dkt. #74 at pp. 61–62). According to Plaintiff, "refus[al] to condemn the unlawful employment of Defendant Williamson" and his participation in the conspiracy is administrative and therefore outside the judicial realm (Dkt. #74 at p. 62).

An assertion of judicial immunity is overcome in only two circumstances. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). First, a judge does not enjoy judicial immunity for nonjudicial actions—

actions taken outside of the judge's judicial capacity. *Id.* Second, a judge does not enjoy judicial immunity for "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12. "Judicial immunity is not overcome by allegations of bad faith or malice." *Id.* at 11; *Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("[I]mmunity applies even when the judge is accused of acting maliciously and corruptly.").

Indeed, "judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). Whether a judge was acting in his or her judicial capacity—that is, whether the function performed was judicial in nature—depends on four factors: (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether the acts arose directly out of a visit to the judge in his official capacity. *Ballard v. Wall*, 413 F.3d 510, 515 (5th Cir. 2005). The factors are construed broadly in favor of immunity. *Id.*

Applied here, these factors would warrant judicial immunity, if there were any violations at all. The summary judgment record only supports finding that Judge Murray was involved in Taylor's prosecution *as a judge*. That is the quintessential judicial function. Aside from not speaking out against Deputy Williamson's hiring (an act that Plaintiff does not claim violated his constitutional rights), Plaintiffs do not submit any relevant conduct that gives rise to Judge

Murray's involvement in this case.[16] That is, except for his role as the presiding Judge. Indeed, the basic building block of this case is whether Taylor's prosecution was unlawful and gives rise to a constitutional claim, based on Plaintiffs' Complaint (*See generally* Dkt. #28). And so, the question is whether Judge Murray's function of presiding over Taylor's pretrial diversion program hearing is a judicial function (*See* Dkt. #56-1 at p. 211; Dkt. #102-2 at p. 4). The answer to that question is a resounding yes, given the factors above. Plaintiffs' Response does not attempt to apply the *Ballard* factors, nor does it isolate any independent conduct of Judge Murray. Because the Court sees no relevant conduct that Judge Murray engaged in which falls outside of his judicial scope, judicial immunity would seem to bar Plaintiffs' claims.

## B.    Prosecutorial Immunity

Next, the Court turns to the matter of prosecutorial immunity as applied to Attorney Garrett. He claims that he is protected from prosecutorial immunity because his only involvement in Taylor's prosecution was as a prosecutor (Dkt. #58 at pp. 28–30). Plaintiffs disagree, arguing that Attorney Garrett's conduct is akin to fabrication of evidence and an investigator, to which immunity does not apply (Dkt. #74 at pp. 62–64).

The Supreme Court of the United States established that prosecutors are "immune from a civil suit for damages under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). But prosecutors are not entitled to immunity simply by virtue of their title; instead, courts are to look

---

[16] Through use of the Declaration of Juan Romero, Plaintiffs suggest that Judge Murray conspired in some sort of retaliatory plot against Taylor for filing the instant lawsuit (*See* Dkt. #102-5). Indeed, in their Response, Plaintiffs claim that judicial immunity does not apply because Judge Murray was not acting in his judicial function when he "attempted to retaliate against . . . Taylor by directing a Delta County Sheriff's Deputy to arrest . . . Taylor for buying alcohol" (Dkt. #74 at p. 62). But Plaintiff's live Complaint does not assert a cause of action for retaliation. If the allegations contained in Romero's Declaration and Plaintiff's Response are true, whether judicial immunity should attach to such conduct is a different question than the inquiry central to this case.

to the "'functional nature of the activities' of which the plaintiff complains." *McGruder v. Necaise*, 733 F.2d 1146, 1148 (5th Cir. 1984) (citations omitted); *accord Imbler*, 424 U.S. at 431; *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997). It is the prosecutor's burden to establish that the "functional nature of the activities" is protected by prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993).

Prosecutors are immune "insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (citations omitted). This does not mean that only actions made during trial are protected; the courts have recognized that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. *Id.* (citations omitted). The Fifth Circuit determined that prosecutorial immunity extends to "investigating . . . a criminal prosecution." *Cook v. Hous. Post*, 616 F.2d 791, 793 (5th Cir. 1980) (citing *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979); *Conner v. Pickett*, 552 F.2d 585 (5th Cir. 1976)).

"[T]he existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature [, as opposed to the investigatory nature,] of prosecutorial conduct." *Cousin v. Small*, 325 F.3d 627, 633 (5th Cir. 2003) (citing *Buckley*, 509 U.S. at 274). Here, again, the only capacity to which Attorney Garrett appears from the summary judgment record to have been involved in this case is that he prosecuted Taylor. As Attorney Garrett puts it, "[h]e reviewed the case file, analyzed the charges against . . . Taylor, and used his professional judgment to determine how the case should be prosecuted." The nature of these activities is entirely prosecutorial. He is therefore immunized from claims derivative of such activities here. *See Loupe v. O'Bannon*, 824 F.3d 534, 539 (5th Cir. 2016).

## C.    Qualified Immunity

Finally, the Court addresses whether Defendants would be entitled to qualified immunity as to Plaintiffs' Fourth Amendment claims based on Deputy Williamson's licensure, given that issue's novelty.[17] Having already determined that Deputy Williamson's licensure does not give rise to a constitutional violation redressable through § 1983, the Court now proceeds directly to qualified immunity's second prong—whether Plaintiffs' right to be free from arrest, search, or prosecution derivative of a law enforcement officer who lacked a up to date peace officer's license is clearly established. *See Cooper*, 844 F.3d at 522.

The second question the Court must address in the qualified immunity analysis is "whether the right was clearly established at the time of the violation." *Id.* "To answer that question in the affirmative, [the Court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 524 (quoting *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc)). But "this does not mean that 'a case directly on point' is required." *Id.* (quoting *Morgan*, 659 F.3d at 372). Rather, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* (quoting *Morgan*, 659 F.3d at 372).

"The central concept is 'fair warning.'" *Id.* (quoting *Morgan*, 659 F.3d at 372; *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional

---

[17] Having determined that Plaintiffs' claims under the Eighth Amendment and the Due Process Clause, as well as the Fourth Amendment's prohibition on excessive force fail, the Court need not address them here.

rights." *Id.* (quoting *Newman*, 703 F.3d at 763). At the same time, satisfying the "clearly established" prong is a "demanding standard" *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Woods v. Harris Cnty., Tex.*, No. 22-20482, 2024 WL 1174185, at *2 (5th Cir. Mar. 19, 2024) (quoting *id.*). "Although the plaintiffs need not point to a factually identical case to demonstrate that the law is clearly established, they nonetheless must provide some controlling precedent that 'squarely governs the specific facts at issue.'" *Craig v. Martin*, 49 F.4th 404, 419 (5th Cir. 2022) (quoting *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019)).

Here, Plaintiffs have in no way satisfied this clearly established prong. In their effort to do so, Plaintiffs cite the Fifth Circuit's statement in *Calhoun v. Villa*, where the Fifth Circuit, recalled that "'a law enforcement officer can make a warrantless arrest only if a federal or state law imbues him with that authority'" (Dkt. #74 at p. 41) (quoting 761 F. App'x 297, 299–300 (5th Cir. 2019)). This holding emerged from the Fifth Circuit's application of the Supreme Court's decision in *Atwater*. *Id.* (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 323 (2001)). Neither *Atwater* nor *Calhoun*, however, contemplate a situation like this case. *Calhoun* and *Atwater* concerned the propriety of misdemeanor arrests without a warrant under the Fourth Amendment. *See Calhoun*, 761 F. App'x at 300 ("Because both misdemeanor violations occurred within view of the officers, they would be justified in making an arrest, even though the violations were only punishable by a fine.); *Atwater*, 532 U.S. at 353 ("[W]e confirm today what our prior cases have intimated: the standard for probable cause applies to all arrests, without the need to balance the interests and circumstances involved in particular situations. If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without

violating the Fourth Amendment, arrest the offender.") (internal quotations and citations omitted). As the Court has established, the Fourth Amendment does not incorporate state licensure requirements. *See supra* II.B.I. If it does, no controlling precedent puts that question beyond debate such that Plaintiffs have overcome qualified immunity.

Plaintiffs simply have not satisfied their burden to show that the right to be free from a search or seizure performed by a law enforcement officer without an active peace officer's license is clearly established. Nor do Plaintiffs show that the right to be free from a prosecution based on the arrest of such an officer is clearly established. Therefore, Plaintiffs have not "provide[d] some controlling precedent that 'squarely governs the specific facts at issue.'" *See Craig*, 49 F.4th at 419. Nor has the Court located any. Hence, even if the Court were to assume that a Fourth Amendment violation did occur as a result of Deputy Williamson's license, the Court would still dismiss Plaintiffs' claims as barred by qualified immunity.

## CONCLUSION

It is therefore **ORDERED** that:

1.    Defendant Jason Murray's Motion for Summary Judgment (Dkt. #56) should be **GRANTED**;

2.    Defendant Jay Garrett's Motion for Summary Judgment (Dkt. #58) should be **GRANTED**;

3.    Defendant Charla Singleton's Motion for Summary Judgment (Dkt. #60) should be **GRANTED**;

4.    Defendant Ricky Smith's Motion for Summary Judgment (Dkt. #62) should be **GRANTED**;

5.    Defendant Zach Williamson's Motion for Summary Judgment (Dkt. #64) should be **GRANTED**; and

6.    Defendant Delta County's Motion for Summary Judgment (Dkt. #66) should be **GRANTED**.

As to Wiley, his claims under Counts I, II, III, IV, V, VIII, IX, X, and XI are hereby **DISMISSED with prejudice until the *Heck* conditions are satisfied**. Further, Wiley's claim under Count VII is hereby **DISMISSED with prejudice**. As to Taylor, Counts I, II, III, IV, V, VI, VIII, IX, X, and XI are hereby **DISMISSED with prejudice**. Finally, Taylor and Wiley's state law claims are hereby **DISMISSED with prejudice**. The Court will enter a separate final judgment.

**IT IS SO ORDERED.**

**SIGNED this 28th day of August, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE